BURRELL et al. v. FLEMING.

FLEMING v. BURRELL et al.

No. 989.

(Circuit Court of Appeals, Fifth Circuit. May 21, 1901.)

1. WRONGFUL DEATH—STATUTORY RIGHT OF ACTION—ENFORCEMENT IN ANOTHER STATE.

A cause of action founded on a statute of one state, conferring a right of action to recover damages for wrongful death, may be enforced in a court of the United States sitting in another state, when it is not inconsistent with the statutes or public policy of the state in which the action is brought.

2. SHIPPING—INJURY TO STEVEDORE—LIABILITY OF SHIP.

A ship, after discharging her cargo, was turned over to stevedores to be cleaned, repaired, and loaded with grain. In a coal bunker on the lower deck were three trimming holes about four feet across, without coamings or covers. The bunker, which extended across the ship, was lighted only by two doors on one side, which were open when the ship was turned over, but which did not afford sufficient light so that the holes in the deck could be seen. Libelant's intestate, who was a carpenter employed by the stevedores in making repairs on the ship. with other workmen, and in accordance with their custom, left his clothes in such bunker while at work, and, on going to get them about 6 o'clock in the evening, fell through one of the trimming holes, and was killed. Held that, while the openings were properly constructed for their required use, and the owners were not in fault in that respect, it was negligence for the officers to turn the vessel over to the stevedores in that condition, with the doors open, and with knowledge of the dangerous open-

ings in a place where the workmen would naturally go, without giving warning of the danger, and that such negligence rendered the owners liable for the injury; the deceased, under the circumstances, not being guilty of contributory negligence.

Pardee, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Eastern District of Louisiana.

J. McConnell (Farrar, Jonas & Kruttschnitt, on the brief), for appellants.

J. C. Walker (Johnson & Johnson and J. B. Rosser, Jr., on the brief), for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. On the 16th of January, 1899, Charles W. Fleming fell through a small hatchway or open trimming hole in the deck of the steamer Styria, and received injuries resulting immediately in his death. The accident occurred in the city and port of Galveston, state of Texas. In Texas, when the death of a person is caused by the negligence or carelessness of an owner or charterer of a steamboat, an action lies for damages. Rev. St. Tex. 1895, art. 3017. There are similar statutes in Louisiana. Voorhies' Civ. Code La. 1875, art. 2315. For the accident occurring in Texas an action lies in Louisiana. A cause of action founded upon the statute in one state, conferring the right to recover damages for injuries resulting in death, may be enforced in a court of the United States sitting in another state, when it is not inconsistent with the statutes or public policy of the state in which the action is brought. Railroad Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 905, 36 L. Ed. 829. The libel, as amended, alleged that Fleming was a landsman doing carpenter's work on the ship, fitting her for grain; that he and his fellow workmen deposited their clothes in a compartment in the lower betweendecks, known as the "spare" or "cross" bunker, where they were expected to place them; that, when work was suspended, and he returned to get his clothes, he fell through "an open trap or small hole" in the deck, and was killed. It was alleged that the hole was unguarded and unlighted, and that no warning of it had been given to any one, though its open and dangerous condition was fully known to the officers of the ship when she was turned over to the stevedores. The answer of the respondents asserted that the decks and hatches of the vessel were safe, and that Fleming lost his life by his own negligence.

The steamer Styria, having arrived in Galveston loaded with a cargo of corn, was, on Friday, January 13, 1899, turned over to the stevedores to be cleaned, repaired, and loaded with grain. The stevedores were occupied for four days (from January 13th to the 16th, inclusive) in taking out the ballast, and cleaning and scraping the ship to fit her to receive the cargo. Fleming, however, was not employed on the ship until January 16th, the day of the accident in which he lost his life. The Styria was a three-deck vessel, the orlopdeck (or lower between-deck) having been cut away from "No. 1

hatch back to the ladder aft of No. 2 hatch," leaving open cargo space from the first between-deck to the bottom of the hold. A platform a few feet in width afforded a place to step off on the orlop-deck aft. The compartment known as the "spare" or "cross" bunker was sometimes used for coal and sometimes for cargo. In the front of the bunker there were two iron doors. The bunker received light only through these doors. The evidence is conflicting as to how dark it was in the bunker. Some of the witnesses say it was dark; others, that faces could be seen and recognized in there. The evidence seems to show clearly that the floor was dark, and that the holes in it could not be seen. In the bunker were three open trimming holes, called also "trimming hatches" by some of the witnesses. They were known to be open by the ship's officers. Through one of these, situated in the port wing, Fleming fell. It is described as a ragged opening in the deck, about four feet square. It was without coamings. The evidence was conflicting as to whether a cover or hatch was kept on the ship for this hole, the weight of evidence indicating that it was not constructed to be kept covered. The doors of the bunker were open when the ship arrived and when she was turned over to the stevedores, but the evidence is conflicting as to whether or not they were kept open all the time she was in port. They were open when Fleming went aboard. In the morning he had been working in No. 3 hold, but in the afternoon was shifted to No. 2 hold, and carried his clothes with him, according to the custom. With others, he entered one of the doors of the bunker, which then stood open, and deposited his clothes in the vicinity of the trimming hole on the port side. Between 5 and 6 o'clock in the afternoon he went into the bunker after his clothes, and about 7 o'clock in the afternoon his body was found directly under the trimming hole on the port side, his neck broken, he having fallen through the hole.

In Cannon v. The Protos (C. C.) 48 Fed. 919, the libelant was a laborer under the head stevedore employed by the master of the ship to unload her cargo. When he quit work on Saturday, he left his overalls in between-decks, and, returning on Monday, he went down the ladder of the main hatchway to get his overalls. While engaged in getting them and changing his clothes, he fell through a small feeding or trimming hole in the lower hold, breaking his arm, and otherwise injuring himself. The court held, Judge Acheson presiding, that it was negligence, for which the vessel was answerable, to leave this small trimming hole open and unguarded in a dark place, where it might be expected the shovelers would go to put on their overalls, and where their clothes were, and where they had a right to go for that purpose. In The Helios (D. C.) 12 Fed. 732, which was an action for damages for personal injuries sustained by falling through a hatch in the between-decks, Judge Brown said:

"When the first mate told the stevedore the vessel was ready for him to proceed to stow the cargo, that was a virtual warranty against all such traps in the darker parts of the vessel, which could not be, or would not be, perceived in the ordinary course of stowage."

Fleming was employed to be on the vessel. He was not there as a volunteer. He unquestionably had the right to pass through the

open door into the bunker, and leave his clothes there. He was not expressly invited to do it, but the situation and circumstances made it perfectly natural that he should do it. It was what was to be expected. Fleming's following the custom of the stevedores to store their clothes in such places, the open doors, the dark place, the open trimming hole, and its unguarded condition, all combined to produce the accident. That the shipowners were guilty of negligence, under the circumstances, in turning the ship over to the stevedores in such condition without warning to them, seems to us, sustained by reason and authority. Gerrity v. The Kate Cann (D. C.) 2 Fed. 241; The Illinois (D. C.) 63 Fed. 161; The Terrier (D. C.) 73 Fed. 265; The Wm. F. Babcock (D. C.) 31 Fed. 418; The Anaces, 34 C. C. A. 558, 93 Fed. 240.

In Gerrity v. The Kate Cann, supra, the court applied to an admiralty case the general principle that "persons inviting others on their premises are answerable for anything in the nature of a trap upon their grounds." The principle seems clearly applicable, but always with the understanding that a ship must be so constructed as to be suited to the purposes for which it is intended; and if, in so constructing it, dangerous places are produced, the shipowners are not in fault. Coaming or railings around the trimming holes would have added to the safety of those on board, but such guards would have rendered the trimming holes less useful, or perhaps useless. The shipowners were not, therefore, in fault for permitting them to remain without coamings or guards. But, knowing that they were in this condition, and in a dark place, a proper care for the safety of others invited aboard ship would require those in charge of the ship to give notice of the danger, or to have the doors that led to the danger securely closed. At all events, it seems to us negligence to have open doors leading to the dangerous holes under circumstances that would almost certainly cause men at work on deck to enter the bunker, where the holes were hid from view by the darkness. The officers of the ship could have prevented the accident by keeping the doors closed which opened into the spare bunker. They were open when the ship was turned over to the stevedores. The custom was for the stevedores, when engaged in cleaning the ship, to leave their clothes in some suitable place on the deck above where they worked. There was no other convenient place except in this bunker. The doors stood open invitingly. On the day Fleming left his clothes in the bunker, at least five other men likewise left theirs. Under the circumstances it was a natural thing to do. Conceding that the trimming holes were not made to be kept covered, they could have easily been covered temporarily; and they were in fact so covered soon after the accident so as to store grain in the bunker. We do not say it was negligence not to cover them. Under all the circumstances of this case, however, we think it was negligence on the part of those in charge of the ship to turn it over to the stevedores with the doors of the bunker open without notice to them of the trimming holes, when they were uncovered, and in a dark place, where the stevedores and men at work on the ship were at liberty to go and likely to go.

The evidence does not sustain the contention that the stevedores' foreman, E. C. Green, had notice of the holes in the bunker. He testifies positively:

"I did not see any opening or hatches or holes in the cross bunker of No. 2 hatch, in the lower 'tween-decks, until after Fleming was killed. I never went in there until after he was killed. I saw them after Fleming was killed, and they were uncovered when I saw them."

We do not think Fleming was guilty of contributory negligence.

The libelant also appealed from the decree. She assigns as error that the damages allowed ($2,500) are insufficient in amount. On the evidence we cannot say that the court erred in fixing the amount. The decree of the district court is affirmed.

PARDEE, Circuit Judge (dissenting). About the middle of January, 1899, the Austrian steamship Styria was in the port of Galveston, Tex., to receive a cargo of grain. Her last cargo had been hides and tallow, and she was in a dirty, slippery, disordered, and greasy condition. I quote from evidence of the stevedore's foreman:

"Well, when I was going through the ship with the master I noticed the dangerous openings below, and I told him this was the God damnest old trap I ever worked in. * * * Well, as stated above, I called the master's attention to the ship being dangerous in general terms, without pointing anything specific; that is, did not point out what was dangerous and what not. If I had undertook to do that, I would have had to take him all over the ship, because she was dangerous all over. She was at one time a tramp emigrant ship before she was put into this service, and for their convenience for general cargo, I suppose, they had cut out the lowest 'tween-decks in sections. This made her very dangerous to those who were not familiar with her."

The construction of the forward part of the Styria was substantially as shown in the two following diagrams:

Just forward of the engine and boiler space and aft of the No. 2 hatchway between the lower decks was a spare cross bunker, intended to carry coal, but also used, on occasion, to carry cargo.

There were round iron chutes running from the upper deck to the second or main deck, through which coal and cargo could be sent down to the bunker; and, in the floor at the bottom were three hatches about four feet square, intended to allow the coal to pass down to the lower deck, and then through doors to the engine room, to supply coal to the furnace. These hatches were without coamings or hatch covers, and were so built and intended for the purpose of allowing coal to pass freely down to the engine room. This bunker extended across the ship, and there were no other openings than those above mentioned except two doors about 20 feet from the nearest hatch, one on the port and one on the starboard side, both opening on to an apron about 3 or 4 feet wide, and thence connecting with the ladder to No. 2 hatch. Thus the cross coal bunker was absolutely without light, and could only have daylight when the door was open; and even then it was dim in the daytime, and, of course, at night, although the doors were open, it was perfectly dark. When the ship was turned over to the stevedore and his gang for the purpose of being cleaned and prepared for grain cargo, the foreman of the stevedore was shown all through the ship by the master and chief officer, and it appears he fully appreciated its condition. On the morning of the 13th the stevedore and his gang took charge of the ship so far as it was necessary for the preparation and cleaning of the same. The stevedore's men worked on the ship day and night throughout the 13th, 14th, 15th, and 16th of January. During all this time the doors of the cross coal bunker were open, and during all this time the stevedore's men used the cross coal bunker to keep their tools and supplies—nails, hatchets, saws, and lumber —and to place their clothes. The men were going into it at all times, and to some extent used it for a lounging and smoking room. On the 14th of January one of the stevedore's men going in or out carrying a plank stepped into one of the hatches, and, according to his own evidence, would have fallen through but for the plank he carried. He was somewhat bruised, and his accident was known to his companions. On the morning of the 16th of January the stevedore's foreman took men into the cross coal bunker to measure up and find the necessary amount of lumber to make the shifting boards fore and aft, so that the bunker might receive cargo; and on the 16th the said cross coal bunker was cleaned to some extent, and nearly prepared for cargo by the stevedore's men. All this was prior to the accident to Fleming. It does not appear decidedly from the evidence when Fleming went to work on the Styria. None of the apparently willing witnesses for the libelant were able to speak in that regard except two, one of whom (Mayfield) testified that Fleming commenced work on the morning of the 16th, and that he saw him at work on another ship the day before; while another witness (Walker), whose evidence seems to be punctuated with a trifle more slang and profanity than that of the other witnesses, testifies that he (Fleming) went to work on Sunday morning, the 15th. However that may be, on Monday, the 16th, about 1 p. m., being called from another hatch to work in No. 2 hatch, he went into the cross coal bunker, and deposited his clothes on the port side

of the ship; then worked somewhere in No. 2 hatch until between 5 and 6 o'clock, when the men were called off with a view of going to work again at 7. About this time—say 5:30 p. m.—Fleming was seen in the cross coal bunker without a light, and he then inquired of a companion outside where were his clothes, saying that he could not find them. The probability is that his clothes had been moved during the cleaning which had been going on more or less in the cross bunker that afternoon. The next seen of Fleming was about 7 o'clock, when he was found at the bottom of the hold, in his work clothes, dead, apparently having fallen through the port hatch of the cross coal bunker. The case seems to show that in searching for his clothes in the cross coal bunker he had fallen through, and met his death at the bottom of the ship. At no time did Fleming use a light when in the cross bunker. Some of the others used lights, all of which were furnished by the stevedore.

The opinion of the court relieves the owners from responsibility so far as the construction of the cross coal bunker and the hatches therein is concerned; that in respect thereto they were not in fault, the necessities of the ship, her economical management, requiring the construction as made; but the court holds that the owners are liable because the doors of the cross coal bunker were left open, and the stevedore's men were not warned of the danger of going into the cross coal bunker. As I have stated the case above, it seems to me that, so far as the warning to the stevedore and his men (who, by the way, are supposed to be more or less experienced in the building and construction of ships, and whose calling it is to work on all sorts of ships at all times of the day and night) is concerned, they had better opportunities to see the dangerous character of the hatches in the cross coal bunker, for they were going and coming in there for four days, cleaned up the same, and used it as a lounging room, than had the officers of the ship, whose occasion to inspect the coal bunker would come seldom, and at long intervals. The late adjudged cases on the subject of warning to stevedore employés are to the effect that a ship which is turned over for loading or coaling to a contractor, who is fully notified of the location of the hatchways and hatches, and that they are uncovered, owes no further duty to the individual stevedore employed by such contractor of the danger from such hatchways, or to protect them therefrom, but such duty devolves upon their employer, and the ship cannot be charged with liability for an injury to a stevedore resulting from his falling through such hatchways. I quote from a well-considered case as follows:

"The ship bore no contractual relation to the libelant. It had not employed him. It had made no contract, expressed or implied, for protecting him. The ship had a right to come to port with all its hatches on or off, or with part of them on or part of them off, quite according to its own convenience; and if it owed a duty of guarding an open hatch, or of advising of its existence, the duty was fulfilled when the conditions were made known to the person to whom it turned over the ship for loading. No duty required it to keep watch of the servants employed by the stevedores, and warn each in turn, or to light the holds so that a person happening to be employed without its knowledge might not fall into a well-known hatchway, nor to cover the hatch for such person's protection. If any in-

struction, warning, or protection was needed, it should have been given by the stevedores. The hatch was not unusual, the absence of the bulkhead between it and hatch No. 2 was not unusual, and its open condition was not unusual, although it was neither necessary nor useful. The general holding seems to be that a stevedore will be presumed to know of the usual hatchways, and of the custom to leave the covers off while the ship is in port. If this be the law, there is nothing unusual about 'the bunker hatch in the present case which should except it from the rule just stated. But the further rule that the contractor's servants must look to him for the observance of duties mandatory between master and servant has full force in such a case, and, when a ship is turned over to such contractor for the purpose of loading, he, if anybody, should be responsible for the dangers that may arise from the open condition of the hatches. The cases relating to injuries by falling through hatchways are collected in the Saratoga (D. C.) 87 Fed. 349, although the conclusion reached in that case was not approved by the circuit court of appeals (36 C. C. A. 208, 94 Fed. 221). See, also, The J. W. Taylor (D. C.) 92 Fed. 193." The Auchenarden (D. C.) 100 Fed. 895, 896.

If this, is the rule when a ship is turned over to a stevedore for loading cargo or coaling, and where the master of the ship practically says to the contractor, "My ship is ready and prepared to receive cargo or coal," it is undoubtedly a safe rule to apply where the master turns his vessel over to the stevedore for cleaning and repairing and fitting up to receive cargo, where the master of the ship practically says to the stevedore and his men: "My ship is out of order. It needs cleaning, fitting up, and preparing to properly, receive cargo." In cases where the cargo has just been discharged it is common knowledge that there are loose lumber, uncovered hatches, and many dangers, covered and uncovered, to deal with. In this connection it is proper to note that the dangerous hatches in the cross coal bunker were actually covered by the stevedore's men when they got ready, and this in the regular line of their employment.

I have examined the record in this case very carefully and attentively, and I am constrained to find that the owners of the Styria were not in fault, and are not liable for the death of Fleming, unless they are insurers against the effects of their own negligence of all the people who may work on the ship. When Fleming went into the cross coal bunker on the 16th to deposit his clothes, there was probably some daylight, and yet he should then have had a light, which it would have been the duty of the stevedore to furnish; and when, after 5 o'clock on the evening of January 16th, after nightfall had set in, he went into the same bunker to search for his clothes, and it was dark, in then neglecting to provide himself with a light he was unquestionably guilty of negligence, more particularly as he then went searching around through the bunker to find his clothes, which had either been misplaced or he had forgotten where he put them.