HAMBURG–AMERIKANISCHE PACKETFAHRT AKTIEN GESELL-
SCHAFT v. GYE.

(Circuit Court of Appeals, Fifth Circuit.   June 2, 1913.   On Rehearing, October 6, 1913.)

No. 2,475.

1. SHIPPING (§ 84*) — LIABILITY FOR INJURIES TO STEVEDORES — DEGREE OF CARE REQUIRED.

The duty of a ship to longshoremen employed thereon is limited to the exercise of ordinary care in providing them with a reasonably safe place to work while engaged in loading or discharging and going to and from such place, and to giving them notice of any latent dangers where they are engaged in work and where their duties require their presence, and, where a longshoreman not at the time engaged in work is permitted to go to a part of the ship where no duty calls him, he is at most a licensee, and the extent of the duty owed him is not to knowingly let him run on a hidden peril or willfully cause him injury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. § 84.*]

2. SHIPPING (§ 80*)—LIABILITY FOR INJURIES TO LICENSEES—DANGEROUS APPLIANCES.

The duty of a ship toward a mere licensee with respect to appliances is fully discharged when she is equipped with appliances reasonably suited to the purpose for which they are used, and such as are customary and usual for ships of that kind.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 335, 341, 352; Dec. Dig. § 80.*]

3. SHIPPING (§ 86*)—LIABILITY FOR INJURY TO LICENSEE.

Libelant's husband was employed as a longshoreman in loading respondent's ship. After taking on cargo at a point across from New Orleans, she crossed the river, and the longshoremen, who had ceased work for the day, stayed on board to be carried across. Libelant's husband, who with others had gone upon the poop deck, where there was an awning, seated himself on a grating covering the rudder quadrant, and while there his foot was caught and crushed by the movement of the steering gear, causing his death. He had been for three years engaged in working on similar vessels, having similar steering apparatus, which was of a usual pattern. None of the longshoremen had any right on such deck, which was for the exclusive use of those navigating the ship, but they went there because of the awning. There was no evidence that any one of the crew saw deceased after he sat upon the grating. *Held*, that the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

facts did not disclose any negligence on the part of respondent which rendered it liable for the injury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 343, 353–360; Dec. Dig. § 86.*]

**4.** ADMIRALTY (§ 118*)—REVIEW ON APPEAL—FINDINGS OF TRIAL COURT.

The rule that findings of fact by the district court in admiralty cases are entitled to great weight in the appellate court is modified when they are based on depositions.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 758–775, 794; Dec. Dig. § 118.*]

**5.** ADMIRALTY (§ 18*)—JURISDICTION—ACTIONS OF TORT.

In an action of tort in a court of admiralty, the locus injuriæ is the test of jurisdiction.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 206–231; Dec. Dig. § 18.*

Jurisdiction of torts, see notes to Campbell v. H. Hackfeld & Co., 62 C. C. A. 279; Monongahela River C. C. & C. Co. v. Schennerer, 117 C. C. A. 205.]

Shelby, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Suit in admiralty by Sarah Gye, widow of John Gye, against the Hamburg-Amerikanische Packetfahrt Aktien Gesellschaft. Decree for libelant, and respondent appeals. Reversed.

James Legendre and Edward Rightor, both of New Orleans, La., for appellants.

John Alonzo Woodville and J. L. Warren Woodville, both of New Orleans, La., for appellee.

Before PARDEE and SHELBY, Circuit Judges, and SHEPPARD, District Judge.

SHEPPARD, District Judge. Sarah Gye, relict of John Gye, brought her libel in the District Court of the United States for the Eastern District of Louisiana in personam, with an order for foreign attachment, against the Hamburg-Amerikanische Packetfahrt Aktien Gesellschaft, for an injury causing the death of her husband, which was due it is alleged to the faulty and negligent construction or arrangement of the covering of the rudder quadrant, a part of the steering gear of the steamship Dortmund, situated on the deck of the poop, consisting of a lattice or grating structure extending about 30 inches above the steering apparatus. Around the rear part of this grating which covered, but did not entirely conceal the quadrant, was a railing which had to be crossed in order to reach the steering wheel. This lattice platform was intended exclusively for the use of those manning the wheel, when it became necessary to maneuver the ship from this locality. Situated about 10 inches directly in front of this lattice platform, and entirely exposed, was a heavy iron "stop," set upright on the deck, intended to arrest the rotary motion of the quadrant as it responded to the tension of the tiller. The quadrant plays underneath this grating until the rudder is put hard to the port or starboard,

at which time it projects from the cover described and sweeps against this post which obstructs its circular motion. The negligent omission of duty charged as the direct cause of the injury was the failure of the owners to cover or protect this space between the grating and this "stop" post in which the end of the quadrant played during the operation of the steering apparatus.

There was no material conflict in the testimony as to the cause and circumstances of the accident. The only conflict worthy of notice is the alleged warning conveyed to the deceased and expressed orders forbidding deceased, with others, the use of the platform constructed over the poop deck. Gye, libelant's decedent, with about 80 longshoremen, had been engaged in the forenoon of May 30, 1911, in stowing cargo on the steamship Dortmund at Westwego, opposite the city of New Orleans. The vessel, having finished taking the cargo at this point, was shifted down to Clouet street, on the left bank of the river. It was Saturday, and it is a reasonable inference supported by all the evidence that the longshoremen aboard had "knocked off" work for that day. They remained on board, preferring to leave the ship at Clouet street on the New Orleans side, presumably to save ferry and car fare. It was not an inhibited practice or unusual for longshoremen to remain aboard while the vessel shifted in the manner stated from one point to another for cargo.

On the poop deck was spread an awning affording a shade and comfortable respite for the time from the glaring sun upon the decks. A number of the screwmen took refuge on this poop deck; Gye and another named Workman seating themselves on the front edge of the platform, their feet resting upon the poop deck. Gye's foot was close, but to the right of, the iron "stop" post, and while the ship was under way from Westwego to Clouet street the rudder either as a result of the current or the steering course caused the quadrant to swing around in the uncovered space, jamming the foot of the deceased hard against the "stop" post, crushing it, from which injury he died six days thereafter.

As to contemporaneous facts, there is some conflict; the testimony, however, at this juncture is important, and will be here quoted literally.

William Priestly, for libelant:

"Q. Do you know whether or not Gye had been told to move from this place previous to the accident? A. No, sir; there was nobody told him to move, because there was no member of the crew, or any officer, or anybody around there to tell us to move.

"Q. Are you sure of that? A. Yes, sir; I am sure of that."

S. G. Ivey, for claimant:

"Q. Well, what called Workman's attention to the dangerous quality of it? A. I don't know. He said to this fellow (Gye): 'Mind out, you will get your feet caught.' None of us were thinking about anything happening.

"Q. None of you thought about such an accident happening? A. No; not when it was shifting. He had no business sitting there really.

"Q. You knew that after the accident happened? A. No; I knew that all the time. The mate himself had ordered us not to go up there. But it was hot, and they had run us out from the other place, and we all went up there.

"Q. Was any officer of the crew up there? A. They ran us out from forward. It was hot, and we all went up there. The mate tried to get us from going up there but we went anyhow. * * *

"Q. You all went aft? A. Yes, sir.

"Q. Were there any members of the ship's crew or officers who told you not to stay there? A. The mate told us not to stay there. He said: 'You have got no business up here.'

"Q. He meant the deck generally? A. No; under that shed there. He didn't want them up there. He tried to get them to leave, and couldn't."

### Hiram Workman, for claimant:

"Q. How long was it before he got hurt that you told him to look out that he would get hurt? A. How long?

"Q. Yes. A. Just from the time it would take my leg to go the full length of it, because my feet were on the steering gear. I had this foot on the steering gear. I was sitting a little higher than I am sitting now. I said, 'Look out you don't get your feet caught in the steering gear.' I looks up, and I says then, 'It's too late now, you are too late, you are caught.' I goes and notifies the foreman, and he asks if he has his arms in the wheel. And I said, 'No; his feet are caught.'

"Q. Did you hear anybody else tell him to move from where he was sitting before he got hurt? A. No, sir."

### Henry Nepperschmidt, for claimant:

"Q. Who is allowed on that part of the deck marked "A" [referring to poop deck]? A. Nobody except the second officer and his watch that are working the ship. Nobody is allowed on that place; and whenever I see anybody off he goes, he must get off there.

"Q. When you say nobody is allowed on that part of the deck marked 'A,' do you mean that such are the regulations and orders now, or were those regulations and orders in existence in years past? A. Ever since the ship was built. * * *

"Q. On what part of the deck can the screwman or longshoreman be when the ship is moving as it was in this case from Westwego to Clouet street? A. In that case we allow the longshoremen to be all over the ship except the poop deck and the forecastle head."

### Max Neureather, for claimant:

"Q. Did you hear the mate or second mate say anything to those men? A. Yes, sir.

"Q. What did he say, what did you hear him say? A. He said, 'Go away from that place out there; you don't leave a place for me to work myself.'

"Q. Were these men—where were those men when the mate spoke to them thus? A. They were on the poop. * * *

"Q. Do you remember whether the mate ordered the men away from the poop deck before or after the accident? A. Before the accident."

### Dan Heggie, for claimant:

"Q. Will you say whether or not before this accident happened to Gye you heard any of the officers of the steamship Dortmund order the men away who were sitting on the poop deck? A. Yes, sir; I heard the chief officer. I saw him run them down off the forecastle head, he ran them down from there; and then there was an awning up on the poop deck, and they were all going up there.

"Q. And what did you hear the chief officer say to them? A. I heard him tell them to get down off of there, he ran them down. He made them get down off the forecastle head. But with the second officer, when he ordered them down they told him they would get out of the road, that they would not be in the road.

"Q. Did you hear any one order them away from the poop deck? A. That is where the second officer was. That is the deck he ordered them away from. He takes charge of the after end of the ship."

Upon this case as made by the foregoing summary of the proof, there was a decree by the district court in favor of libelant and against the Hamburg-Amerikanische Packetfahrt Aktien Gesellschaft for $3,000, from which the claimant appealed, and assigns as error that the judgment was unwarranted by the law and the evidence, and that, notwithstanding the injury was received on navigable waters of the United States, the libelant's decedent died ashore; therefore, the court was without jurisdiction.

The liability of the shipowners, if any exists for the loss sustained by libelant, depends upon the duty owed by the owners of the steamship Dortmund to the libelant's husband. Gye was a longshoreman, and had been recently engaged working cargo. At the time of the injury he was not discharging any duty aboard ship; his crew had finished their work in the hold where their employment called them, and Gye for his own comfort and convenience had voluntarily resorted to the poop deck, where not only no duty required him, but at a place, according to a preponderance of the evidence, he had been ordered not to "gang." Assuming that he had not been forbidden the liberty of the poop deck, nor warned of the dangers of the place, no duty required him there, nor was there any express invitation to justify his presence on the platform, constructed for the particular use of those controlling the course and direction of the ship. The particular locality was not inherently dangerous to any one knowing of the operation of the steering apparatus. Gye had three years' experience as a longshoreman, with the opportunities that period afforded him of acquaintance with the construction, use, and operation of such apparatus, which the evidence shows was not unusual but of customary design as compared with vessels of that size engaged in like trade. To ascertain the particular duty owing the decedent at the time of the injury, it is necessary to determine his status as it related to the ship at the particular moment of the injury.

[1] The duty of the shipowners, like that of masters generally, is to exercise ordinary care in providing a reasonably safe place for the laborers while engaged in the work of loading or discharging and going to and from such place. Pioneer S. S. Co. v. McCann, 170 Fed. 873, 96 C. C. A. 49; The General Knox (D. C.) 180 Fed. 489; The Italia (D. C.) 178 Fed. 996; Burrell v. Fleming, 109 Fed. 489, 47 C. C. A. 598. This rule has been qualified to some extent by a line of cases which hold that the ship owes no duty to the stevedores as a class, except not to wantonly injure them when once they are put to work under reasonably safe environments with full information to the foreman of any latent or concealed danger in the place or surroundings. The Auchenarden (D. C.) 100 Fed. 895; West India P. & S. S. Co. v. Weibel, 113 Fed. 169, 51 C. C. A. 116; Burrell v. Fleming, supra. The authority of these cases, as well as those cited by proctor for li-

belant, are to the effect that longshoremen are entitled to a safe place and surroundings in which to work, and to notice of latent dangers where they are engaged in work, and where their duties require their presence. No duty was required of a longshoreman on the poop deck of the Dortmund—deceased was not in the discharge of any duty there. Therefore, it cannot be insisted that Gye was an employé at the time of the injury and entitled to the safeguards devolved upon the employer to provide; nor could he be from any aspect of the case an invitee and entitled as such to the care and attention of the employer.

Invitation is inferred when there is a common interest or mutual advantage. What common interest or mutual advantage induced Gye to seat himself upon this grating? Absolutely nothing apart from his own comfort and pleasure. Gye was or was not a trespasser, according to the fact whether he was or was not ordered away from the premises; but aside from resolving that fact one way or the other, and conceding arguendo, he was under the facts of the case a licensee. In that event, we find that the extent of duty devolving upon the owner would be not knowingly to let him run upon a hidden peril or willfully cause him injury. 4 Words and Phrases, p. 3760; Zanone v. Oceanic Steam Navig. Co., 177 Fed. 912, 101 C. C. A. 192; The Montrose (D. C.) 179 Fed. 1000. Gye's employment had terminated, and he was merely biding his opportunity to leave the ship. In the case of The Thomas Turnbull (D. C.) 99 Fed. 781, a steamship was approaching the dock, a rope ladder was dropped over the side to enable a seaman to land upon the pier, in the hurry of the moment it was dropped in front of a siphon connected with a donkey engine, and while the ship was being moored a stevedore started to climb on board to seek employment, which was customary at the port. When opposite the exhaust pipe, the engine was started for some purpose, and the man was scalded. The end of the pipe could have been seen from the pier and its nature and use were known. It was held there was no liability, as there could be no claim that it was known that the stevedore was coming on board when the engine was started, and that he was chargeable with notice of the danger. In that case the employment had not begun; in the instant case, the employment had ended. It was not known that Gye would assume a place of danger, and furthermore, with his experience as a stevedore he must be chargeable with notice of the operation of the steering apparatus.

[2] At most, we think the duty of the ship to a mere licensee is fully discharged when she is equipped with appliances reasonably suited to the purpose for which they are adapted, and such as are customary and usual for ships of that kind. As has already been seen, Gye had three years' experience as a longshoreman; he ought to have known of the construction and operation of the steering apparatus on such vessels, and that the quadrant was necessarily in motion, and was such an apparatus as is usually found upon nearly all such steamships. The danger should be apparent to any longshoreman of experience.

The Burgundia (D. C.) 29 Fed. 464, is a case where a child left unattended was injured by placing its hands in a rudder chain box on the main deck. The child was a passenger. In that case, it was said:

"The wooden box or groove was such as is usual upon nearly all steamships, and," though left open, "no customary precaution was neglected. * * * It is plain that the child was where it had no business to be."

[3] Taking the most favorable view of the case for libelant, giving him the most favored status that could be predicated on the evidence, that of a licensee, we conclude there was no breach of duty for which the owners of the steamship could be held responsible. There is a strong preponderance of evidence that Gye was ordered not to go on the poop deck, and to leave it before the lamentable accident which caused his death.

We have seen that there was no relation of master and servant existing; we have seen that under no aspect of the case could Gye be regarded as a passenger. He could no more be regarded an invitee to this "poop" deck, which according to the evidence was for the exclusive use of those navigating the ship, than he could be legally contemplated a passenger. Gye was no more invited to this reserved quarter than was he to the rigging or the bridge. If Gye was a trespasser when he received the injury, and it only requires an application of the law to the facts of the case to make this conclusion inevitable, then the only duty devolving upon the owners of the ship was not to wantonly injure him after his perilous position was discovered. There is no evidence that any of the vessel's crew engaged in her navigation discovered the perilous position of deceased before the injury.

[4] While we recognize the rule that the findings of fact in admiralty causes by the district court are entitled to great weight by the appellate court, the reason for the rule is based upon the trial court's opportunity for judging the credibility of the witnesses; the reason for the rule ceases, however, when the trial court's finding is based, as it was in the present case, on depositions. The Santa Rita, 176 Fed. 890, 100 C. C. A. 360, 12 L. R. A. (N. S.) 1210; The Edward Smith, 135 Fed. 32, 67 C. C. A. 506; Lazarus v. Barber, 136 Fed. 534, 69 C. C. A. 310; Royal Exch. Assur. v. Graham & Morton Transp. Co., 166 Fed. 32, 92 C. C. A. 66.

The case of libelant has been most carefully and thoroughly presented by her counsel, and it has received at the hands of this court that careful consideration which the unfortunate consequences demand. Deplorable as were the results of this unfortunate occurrence to the libelant, the law cannot on the facts, as we see them, afford any redress.

[5] We deem it unnecessary in view of the conclusion reached on the merits to advert to the question of jurisdiction, more than to say that it is well settled by the weight of modern authority that the locus injuriæ is the test of jurisdiction. The Strabo, 98 Fed. 998, 39 C. C. A. 375; The Aurora (D. C.) 163 Fed. 634.

The decree is reversed, with directions to dismiss the libel, and it will be so ordered.

SHELBY, Circuit Judge (dissenting). The evidence, as I understand it, fully sustains the decree of the District Court, and I think it

should be affirmed. Burrell v. Fleming, 109 Fed. 489, and authorities cited on page 492, 47 C. C. A. 598; West India & P. S. S. Co. v. Weibel, 113 Fed. 169, 171, 51 C. C. A. 116.

## On Rehearing.

PER CURIAM. No one of the judges who concurred in this opinion desiring a rehearing, the same is denied.

NOTE.—The following are the reasons of the court below for the decree entered:

FOSTER, District Judge. In this matter the libelant is seeking to recover damages for the death of her husband, who received injuries while acting as a longshoreman, or laborer, on the steamship Dortmund, owned by the respondent, from which he subsequently died. It appears that on the after deck of the ship the steering gear is so arranged as to be partly covered by a wooden platform, which conceals the movement of the tiller, or rudder quadrant. This platform is of a convenient height to afford a comfortable seat, and it consists of a grating intended as a platform for the steersman to stand upon when steering the ship by hand. The ship was proceeding from Westwego down the river to Clouet street, in the city of New Orleans, and had on board the men who were to continue the work of loading when she, reached her destination. They were congregated on the main deck of the ship, were ordered to leave, and some 35 or 40 of them went up on the after deck, which was covered with an awning. There the deceased and two others seated themselves upon the platform covering the steering gear. About the center of the deck an iron stop was fastened, just at the edge of the platform. This stop was intended to prevent the rudder quadrant from going past the center line; but, as will appear from the sketch in evidence and the testimony of the witnesses, there was nothing to indicate that the quadrant would strike against this stop. The deceased was not warned by any officer of the ship of the danger, nor to avoid it. He was warned by one of his fellow workers, but too late to avoid the accident. Either the operation of the steam steering gear, or the force of the current in the river caused the rudder quadrant to come around with great force and catch the foot of the deceased between it and the stop, mashing it to a pulp. From the injury thus received the man died some few days after.

It was certainly the duty of the ship to protect any one lawfully on her from the hidden danger of this quadrant under the circumstances of the case. The platform was an attractive place to men who had been working, and I do not find that the deceased was guilty of any negligence in seating himself upon it, or that the danger was apparent or should have been known to him in the exercise of reasonable care. See The Eddystone (D. C.) 33 Fed. 925; Boden v. Demwolf (D. C.) 56 Fed. 846; The Montrose (D. C.) 179 Fed. 1001; Burrell v. Flemming, 109 Fed. 489, 47 C. C. A. 598; Pioneer S. S. Co. v. McCann, 170 Fed. 873, 96 C. C. A. 49.

There will be a decree in favor of libelant in the sum of $3,000.