**THIBEAULT v. BOSTON TOWBOAT CO. et al.**

No. 771.

District Court, D. Massachusetts.

June 20, 1939.

Harry Kisloff, of Boston, Mass., for libellant.

Albert T. Gould (Bingham, Dana & Gould and Howard F. Fanning, all of Boston, Mass., of counsel), for Boston Towboat Co.

Francis P. Garland (Hurlburt, Jones & Hall, all of Boston, Mass., of counsel), for Mystic Terminal Co., Boston & Maine R. R. and Howard S. Palmer et al., trustees of New York, N. H. & H. R. R.

FORD, District Judge.

This is a suit in admiralty brought by the libellant against the above named respondents, in which he seeks to recover for personal injuries received while employed as a member of the crew of the tugboat "Confidence," by its owner, the Boston Towboat Company, hereinafter called the "Towboat Company." Maintenance and cure is also sought against the Towboat Company.

The special findings of fact demanded under Rule 46½, Title 28 U.S.C.A. following Section 723, are as follows:

On October 11, 1937, the Towboat Company contracted orally with the Mystic Terminal Company, hereinafter called the "Terminal Company," to tow a car float to a vessel owned by the United Fruit Company which was docked alongside a wharf on Atlantic Avenue, in Boston. The towage services were secured in accordance with an arrangement that existed for many years between the Terminal Company and the United Fruit Company. A representative of the United Fruit Company notified the Towboat Company by telephone to take the car float from Pier 47, Mystic Docks and place it alongside of a certain United Fruit Company steamer which lay in its berth at Long Wharf. There was no written contract existing between the parties in this connection.

The float upon which the accident occurred was of the usual rectangular shape, 196 feet long and 34 feet in width. The car float was owned by the Trustees of the New York, New Haven and Hartford Railroad Company and had been leased to the Boston and Maine Railroad April 1, 1935, and was being used on the day of the accident by the respondent Terminal Company with the consent and permission of the Boston and Maine Railroad. There was a contract existing between the New York, New Haven and Hartford Railroad Company and the Boston and Maine Railroad by the terms of which the latter agreed to keep the float in repair, reasonable wear and tear excepted. There were three other floats of similar type being used in Boston harbor. It had a crew of two, employed by the Terminal Company, consist-

ing of a barge or car float captain and a deck hand. There were tracks with a capacity for eight freight cars on either side of a loading platform about seven feet wide which ran down between the tracks in the middle of the float practically its whole length. Over the entire length of the loading platform was a roof with a slight pitch, obviously constructed for weather protection for the platform. The roof was so constructed that it was on a level with the freight cars when the latter were in place on the tracks. The roof was about twelve feet above the loading platform, of the same width as the latter, and it was constructed of seven-eighths-inch matched boards with cleats upon it for its entire length. When the freight cars were in place there was a space of about six inches between the edge of the freight cars and the edges of the roof. The freight cars were always placed on the float so that there was a space of about six feet between the cars on the side of the float nearer the ship from which the cargo was being discharged in order to make room for gangways, but there was no space left between the cars on the side away from the ship except the usual space left when cars of this sort are coupled together. There was a space of about eighteen inches or two feet between the sides of the freight cars and the bollards which were constructed inside a heavy twelve-inch rail which ran lengthwise along both sides of the float. A person of sizeable proportions, because of this narrow space, had some difficulty in passing from the stern to the bow of the float along its sides when the freight cars were in place. There were no ladders of any sort leading to the aforementioned roof from the loading platform, nor was there any runway on it such as is ordinarily seen on the roof of a freight car.

Abundant evidence was introduced by the libellant, and I find it to be a fact, that a well defined custom of usage had existed in reference to the manner of towing car floats of the type in question here, at least for a period of twenty-five years prior to the date of the accident.

It was customary to make the tug fast to the float on its port-quarter by three lines, bow, tow, and stern, in such a manner that the bow of the tug would ordinarily be about eighty feet distant from the bow of the float. It was customary to send a man, usually a captain or a mate, up on the top of the float to pass signals to the operator in the wheelhouse of the tugboat. It was the first duty of this man to walk the length of the float and see that the chains that held her to the slip were properly released. The man assigned would go up the ladder of the freight car, cross over the roof above the loading platform from the port to the starboard side and then go forward along the roof to the forward end of the float. At the forward end he would stand upon the freight cars nearer the towboat on the port side of the float. Here he would give the signal that all was clear and he would move from the top of freight cars on the port side to the top of freight cars on the starboard side across the roof to see that the float and tug fouled nothing in going out from the slip. When the float was out of the slip the man assigned would take his position upon the freight cars or the roof in question so that he could see all navigation. To do this it was convenient for him to cross and recross the roof from one side to the other. The number of times he would cross the structure would depend upon the state of navigation in the harbor and the number of signals necessary to be given to the pilot in the wheelhouse who relied upon him for knowledge as to the state of the navigation on both port and starboard sides of the float. When the time came for the float to make a swing into the wharf alongside the ship to be unloaded it was necessary for this man, stationed as a lookout, to pass to the starboard side of the float, if he were not already there, and take up his position on the freight cars on the starboard side. There he would proceed as far forward as he could to watch the starboard corner of the float going in at an angle. The maneuvering of the float at this point was done in rather a restricted area and the forward part of the float would just skin the ship in coming in. It was the duty of the lookout at this point to make calculations in order that the starboard corner of the float would come as near as possible to the ship without coming in collision with it. This necessitated his giving signals quickly to the operator in the pilothouse to go to the right or the left, to slow down, go ahead, or reverse engines. The number and speed necessary in giving signals depended to considerable extent on the wind and tide. It was also his duty here to see to it that the freight cars' roofs would not foul the ship as the float came in. To give the necessary signals he crossed and recrossed the roof from starboard to port as many as twenty-five times in this opera-

tion. He was compelled to do this because a tugboat of the "Confidence" type, which was the type usually used in a towage job of this sort, sat low in the water and when tied up to the float on the port side its pilothouse was below the roofs of the freight cars on the float and the man at the wheel could not see a lookout giving signals on the starboard side of the float. The "Confidence" was about sixty-five feet long and the distance from its deck to the water was about seven feet, and from the window of the pilothouse to the water was about twelve feet.

The evidence also showed it was dangerous at times to occupy a position as a lookout on the freight cars, because the vibration of the engines and the motion of the water was transferred to the freight cars causing them to sway. This was especially true in windy weather. At other times in slippery weather it was dangerous to stand atop the freight cars as a sudden motion might throw the lookout into the water. Further, it was the usage, when the car float was being loaded, for the stevedores and longshoremen to come aboard the float from the ship to be unloaded across a plank to the tops of freight cars, cross the roof constructed over the loading platform and go down the ladders of the freight cars to their stations. This was compelled because the ports of the vessel were filled with fruit (bananas here) and they could not go on the float through the ports of the ship. Also, the crew of the car float crossed and recrossed this roof in the performance of their duties in sealing and checking freight cars and ventilators on the latter. All this was known for a number of years to the Terminal Company and no objection had been made by it, or any of its agents, to the usage of the roof for the purposes mentioned above in connection with the operation of the towboat and the float.

The libellant was thirty-five years of age and weighed 190 pounds. He was a licensed pilot and had been a towboat mate for about a year before the accident. At the time of the accident he was employed by the Towboat Company as a mate and had worked for the company eight or nine years, and at the time of the accident was "riding" the car float for the first time, although he had been aboard her many times before. The term "riding" the car float meant acting as a lookout for navigation and giving signals to the captain in the wheelhouse. He was stationed on the car float as a lookout on the day of the accident under orders of the captain of the towboat. He took his position on the float about seven o'clock on the morning of the day in question by walking on top of the car float to its forward end to see that all was clear. All being clear he gave the signal to the captain to go astern and then he took up his position in the center of the roof of the float in order to observe the navigation as the float proceeded across the harbor and to give signals in accordance with the state of the latter to the captain. When the boat neared the United Fruit Company wharves he crossed over the roof from the port to the starboard side to the forward end of the freight cars in order to observe the starboard corner of the float as it passed the vessel from which it was to secure its freight. In performing these duties and giving the customary necessary signals to the captain he found it necessary to cross the roof in question from the starboard side nearer the ship to the port side where he could be seen by the captain, at least seven or eight times. When the float was finally tied up to the ship he walked back across the roof from the loading platform to the port side in order to give the final signal to the captain that all was secured as to lines. When he reached a point about twenty feet from the forward end of the roof toward the port side of the float, his left leg went through the cleats and boards of the roof making a hole in it ten or twelve inches in width and causing the injuries for which he now seeks to recover. As he crossed over the roof he noticed nothing wrong with its condition.

The testimony of the libellant proved that after the accident happened the boards of the roof where the libellant fell were hanging in splinters and the wood was in a crumbly and rotted condition and its color black. When the roof was examined, on the occasion of the installation of a new roof a few days after the accident, by an employee of the respondent Boston and Maine Railroad, and a record made of its condition, the latter showed that the roof was in a decayed condition at the time of the accident. The record further reflected that the reason for constructing the new roof was the decayed condition of the old upon which the accident happened. The evidence further showed that this decay covered quite an extensive area including the place where the accident happened and that the roof was warped in various places

and that the latter condition was visible. The warping was evident along the sides of the roof where the nailing strip was located and nails had been missing from the cleats at this point for about a month before the accident. The evidence also showed that the agents of the owner of the float, whose duty it was to inspect it, knew that water was likely to get in underneath the cleats of the roof and cause rot and that decay had been found in these places at times when the roof had been previously inspected.

The evidence further showed that the lessee of the car float, the Boston and Maine Railroad, had, through its agents, inspected the float about once a month for two or three years before the accident, the last inspection being on September 21, 1937, about three weeks before the accident happened. No reports of inspections were made. These inspections consisted of viewing the roof from positions on top, and the underneath side of it from the loading platform twelve feet below. That at no time were any cleats removed from the roof to determine the condition underneath them, although it was well known that water would be likely to cause rot. Taking the evidence as a whole the testimony showed that whatever inspection was made was little more than casual and the records introduced showed dates of inspection for more than two years which were silent as to any condition of the roof. Nor did they show that the roof itself was inspected. However, the testimony shows that repairs had been made during this period and that several of the boards and cleats of the roof had been renewed where decay had been found. A Mr. Ray who made the temporary repairs covering the hole caused by the fall of the libellant and who is still in the employ of the Boston and Maine Railroad, at the time of the trial was not called as a witness, nor was a Mr. Harkins, employed by the Boston and Maine Railroad, who with Mr. Ray made an inspection of the place a few days after the accident.

As appears above, the Terminal Company was operating and in control of the car float. No serious contention was made that the respondents, Trustees of the New York, New Haven and Hartford Railroad Company and the Boston and Maine Railroad, must respond in damages and I conclude that they cannot be compelled to do so. The Towboat Company was in no way at fault for the libellant's injuries and should not be compelled to respond except as to maintenance and cure, which I shall discuss later.

The main defense set up by several of the respondents against liability for the accident to the libellant is that the latter was a mere licensee upon the roof over the loading platform of the float at the time of his injury and that there was a total absence of any wanton, reckless, or wilful misconduct toward him, which would make them liable. But was the libellant a mere licensee? The contract of towage was oral; it consisted merely of an order telephoned on behalf of the Terminal Company and with the latter's authority and accepted by the Towboat Company. What were its terms? To tow the float between the points designated, to be sure, but also to do so on the terms and conditions that had been established as a result of previous dealings between the parties. Sun Oil Co. v. Dalzell Towing Co., Inc., 2 Cir., 55 F.2d 63; affirmed 287 U.S. 291, 53 S.Ct. 135, 77 L. Ed. 311.

One of the terms of the contract that had been thus established was that the towage should be done in accordance with the custom and usage that had been long established and was well known, at least, to the Terminal Company and was acquiesced in by it, to wit, the use of the roof over the loading platform in the exact manner in which it was used by the libellant at the time of the accident in passing and repassing over the roof for the purpose of giving signals to the captain in the wheelhouse. It must be found that it was the intention of the parties to include such usage within the terms of the contract of towage. In view of this, it cannot be denied that there was an implied invitation to the libellant to go upon the float which was being operated by the Terminal Company and use the roof for the purposes above enumerated.

Further, it was absolutely necessary for the libellant to use the tops of the freight cars for lookout purposes, in view of their position on the float, and hence there was an implied invitation to use them. None of the respondents seriously question this. Likewise the use of the roof of the runway was fairly incidental to the work the libellant was performing. Although there was no runway upon the roof or other physical characteristics to encourage its use for passing over it, as there was on top of freight cars, yet its adjacency to the freight cars, its equal height with them, its convenience in expediting the giving of signals

to the operator in the pilothouse of the tug, with the necessity for its use in windy, stormy, or slippery weather, its long use for purposes connected with the business conducted on the float that was known and acquiesced in by the Terminal Company, lead me to conclude that its usage for the purposes named above was reasonable, natural, necessary, and quite incidental to the work of the libellant, making him an invitee. Carpenter v. Sinclair Refining Co., 237 Mass. 230, 129 N.E. 383; Griswold, Adm'x, v. Boston & Maine Railroad, 213 Mass. 12, 99 N.E. 474; Crimmins v. Booth, 202 Mass. 17, 88 N.E. 449, 132 Am.St.Rep. 468; Boyle, Adm'r, v. Columbian Fire Proofing Co., 182 Mass. 93, 64 N.E. 726; Conley v. Consolidation Coastwise Co., D.C., 242 F. 591; Standard Steel Car Co. v. McGuire, 3 Cir., 161 F. 527; Burrell et al. v. Fleming, 5 Cir., 109 F. 489; The Illinois, D.C., 63 F. 161.

For these reasons, it is my conclusion that the libellant herein was more than a mere licensee on the float of the Terminal Company; he was an invitee upon the float and upon the roof over the runway in the use of the latter in carrying out his duties as a lookout and signalman.

The cases of Murphy, Adm'x, v. Boston & Maine Railroad, 248 Mass. 78, 142 N.E. 782; Cole v. L. D. Willcutt & Sons Co., 214 Mass. 453, 101 N.E. 995; and Hillman v. Boston Elevated Railway Company, 207 Mass. 478, 93 N.E. 653, 32 L.R.A.,N.S., 198, cited by the respondents in their brief, have no application to the present case. These cases are inapposite in that there was not therein a usage of premises incidental to the workmen's employment.

The Terminal Company had control and possession of the car float at the time of the accident and in addition was using it in its own business. It was adopted as part of their own equipment and one of its instrumentalities, and it is subject to the same liability as though it were the owner of the float. D'Almeida, Adm'r, v. Boston & Maine Railroad, 209 Mass. 81, 95 N.E. 398, Ann.Cas.1913C, 751; McNamara v. Boston & Maine Railroad, 202 Mass. 491, 495, 89 N.E. 131; and Ladd v. New York, New Haven & Hartford Railroad Co., 193 Mass. 359, 362, 79 N.E. 742, 9 L.R.A.,N.S., 874, 9 Ann.Cas. 988. As it was its duty to use reasonable care to provide a safe place for the libellant to work, it was its duty in this case to use reasonable care to see to it that the roof here in question which the libellant used in the performance of his work was in a safe and proper condition. Conley v. Consolidation Coastwise Co., supra; Pioneer Steamship Co. v. McCann, 6 Cir., 170 F. 873; The Martha E. Wallace, D.C., 151 F. 353, 354; Burrell et al. v. Fleming, supra; The Illinois, supra. That this duty, owed by the respondent Terminal Company, was violated is patent from the facts and it is liable in damages to the libellant. At the time the accident happened, the roof including the place where the libellant fell through was in a rotted, decayed, and warped condition with nails missing from the cleats, and although those who made the inspections knew that water was likely to get underneath the cleats and cause just such a condition, as it previously had done to their knowledge, yet nothing was done to discover it. Roofs do get rotten and a mere look at the roof from a point on the loading platform twelve feet below it or a cursory glance at the top of the roof, as was the case here, does not satisfy requirements of a reasonably adequate inspection to discover the fact, especially where attention has been aroused. In fact no written report was produced to show the results of any inspections of the roof before the accident. The mere lifting of a cleat, the use of suitable appliances to discover rot in roofs, or almost any proper inspection would have revealed the rotten and dangerous condition of the roof, especially where it was so extensive as here and where the crumbly condition and dark color of the boards at the place the libellant fell indicated that the condition existed for some time. Boutlier, Adm'x, v. City of Malden, 226 Mass. 479, 485, 116 N.E. 251, Ann.Cas.1918C, 910; Lutolf, Adm'x, v. United Electric Light Co., 184 Mass. 53, 57, 67 N.E. 1025.

There was no evidence that any employees of the Terminal Company made any inspection; whatever inspections were made were done by the respondent, Boston and Maine Railroad, under its contract to make repairs with the New York, New Haven and Hartford Railroad Company, from whom it had leased the float. And assuming that the Terminal Company relied upon these inspections as made in its behalf and as the performance of its duty in this direction toward the libellant, it is bound by their inadequacy in fulfilling the duty that it owed to the libellant to exercise reasonable care to provide him a safe place in which to work.

■ It is admitted that the Towboat Company is liable to the libellant for maintenance and cure. However, in view of the fact that the Terminal Company was solely at fault and liable for compensatory damages, which include maintenance and cure, it is primarily liable for whatever damages are to be awarded as such, and here the Towboat Company will respond, only in the event of the Terminal Company's failure to pay whatever damages are decreed for maintenance and cure. The Jefferson Myers, 2 Cir., 45 F.2d 162; Seely v. City of New York et al., 2 Cir., 24 F.2d 412.

The requests of the parties for rulings of law, so far as they are consistent with the above, are granted, and to the extent that they differ from the above, they are denied.

The case is referred to a Commissioner for the purpose of assessing damages and a decree may be entered for the amounts assessed in accordance with the above opinion.