Edward C. Murray *et al.*

*v.*

Jane McLean, Administratrix.

1. Negligence—*degree of care required to prevent injury to others upon one's own premises.* The occupant of a building is not bound to insure the

safety of persons who may come upon the premises. He is held to the use, not of the utmost, but only reasonable care and caution under the circumstances, to prevent others from receiving harm.

2. In an action under the statute to recover for the death of a person, occasioned by the alleged negligence of the defendants, it appeared the defendants were large tobacco manufacturers, and in the building occupied by them, hogsheads of tobacco and other heavy material were carried from the first floor to the different floors above, by means of an elevator running through hatchways cut in each floor. These hatchways were situated some distance back from the front of the building, away from the office and out of the reach of persons having business to transact with the house, where no one except the inmates of the house and employees could be reasonably expected to go, and were surrounded, except when the elevator was in use, by railing from three to four feet high. The building was considered very good as to light, and in the basement, from four to six feet from the hatchway in the first floor, a gas jet was kept constantly burning. At the time of the accident, between nine and ten o'clock in the morning, the elevator was in use, carrying hogsheads of tobacco from the first to the fourth floor. Two men were engaged at the work. They would roll a hogshead on the elevator, get on with it, ride to the fourth floor, unload and descend. While the elevator was thus in use, the deceased fell through the hatchway in the first floor, receiving injuries from which he died. It appeared the deceased, who was a cooper, furnished the defendants with kegs for packing purposes, and was in the habit of bringing them in a wagon to the front door of the building to unload. The first that was known of him about the building on the morning of the accident, was from his cries in the cellar just under the hatchway, while the elevator was at the fourth story with a hogshead of tobacco. Immediately afterward his wagon was found at the door, with a load of kegs upon it. Keeping the mouth of the hatchway unguarded while the elevator was thus in use, was the only negligence imputable to the defendants: *Held*, while the defendants might have prevented the injury by the employment of an additional force, so as to have kept a guard stationed at the hatchway for the express purpose of protecting persons from injury by falling into it, the law imposed no such burden upon men's conduct of their ordinary private business upon their own premises.

3. But had the hatchway been at a place where persons were accustomed to pass and repass, or to be about, and their presence there ought to have been reasonably anticipated, a higher degree of care might have been exacted of the defendants.

4. EVIDENCE—*credibility of witnesses when in the employment of the party for whom they are called.* The mere fact that witnesses are in the employment of the party for whom they are called, will not justify the jury in discrediting them to the extent of rejecting their testimony entirely.

5. ABSTRACTS—*costs.* In this case the appellants printed the entire testimony, which was very voluminous, and not being in compliance with the rule in respect to abstracts, the costs of the so-called abstract were taxed against the appellants, although the judgment was reversed.

APPEAL from the Superior Court of Chicago; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. MOORE & CAULFIELD, for the appellants.

Messrs. HERVEY, ANTHONY & GALT, for the appellee.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

The testimony in this case shows the defendants, Murray & Mason, were large tobacco. manufacturers, occupying for that purpose the two buildings being Nos. 174 and 176 North Water street, in the city of Chicago. These two buildings so communicated with each other by means of archways as to be used as one. The houses were four stories high, with a cellar, and fronted to the north. Hogsheads of tobacco and heavy material were carried from the first floor to the different floors above, by means of an elevator running through hatchways cut in each floor. This elevator operated in one of the buildings, to-wit, 174, the west building, up and down the west side of the wall dividing the two houses. It was communicated with from the east building by means of arches cut in the dividing wall (or No. 176;) each of these hatchways was surrounded by rails from three to four feet high, as we think the proof shows. The hatchway on the first floor (above the cellar) was so surrounded in No. 174, and in 176 it was protected by a sliding bar across the mouth of the hatchway. On the second floor the hatchway was similarly protected. These two floors are the only floors in controversy in this case. The testimony shows, that the floor of 176 extends the thickness of the dividing wall through the opening to the elevator, and that the hatchway does not extend from 174 to the east side of the

dividing wall.    Therefore, the whole opening of the hatchway is in the floor of 174.

The testimony shows, that on the morning of the 15th day of April, 1869, the elevator was in actual use, carrying hogsheads of tobacco from the first to the fourth floor; that the hogsheads were around the archway on the first floor in 176; that two men were engaged at the work; that the bar across the mouth of the hatchway was drawn aside; that the two men would roll a hogshead on the elevator, get on with it, ride up to the fourth floor, take off the hogshead and descend again to the first; that the time occupied in going up and returning was about two or three minutes.

The deceased was a cooper, carrying on his trade in Chicago. Among others, he furnished Murray & Mason, the defendants, with kegs, etc., for packing purposes.    He was in the habit of bringing the kegs in a wagon to the front door.    Just after the accident, his wagon was found at the door with a load of kegs upon it.  The deceased had not shown himself to any one in the office, and was not seen about the building prior to his fall. The first that was known of him in the building at all was from his cries in the cellar just under the hatchway, while the elevator was at the fourth floor going up and down with a hogshead of tobacco.    He was immediately taken by Mr. Mason, one of the firm, and other inmates of the house, from the cellar up to the first floor by the back stairway, and seated on a box in front of the hatchway.    Mr. Mason there asked him how he happened to be there; he replied, "he did not know what took him there; that he had no business there at all;" saying, "I knew where the hatchway was just as well as you gentlemen do."   He was then taken into the front office and cared for. While there, he several times reiterated the foregoing remarks. After all was done for him that could be done in the office of Murray & Mason, he was taken in a carriage to his home, and a physician sent by Murray & Mason immediately to his home to dress his wounds.  The deceased's family, however, had sent for another physician, and both united in their attention and

services to the wounded man. The evidence of both physicians is, that when they left him there was no apparent danger of death whatever. The physician sent by Murray & Mason, never saw him after the first visit, as he was told his services would not be needed. McLean, however, died within the next two or three weeks. This suit is brought under the statute, by his wife as administratrix, to recover damages, &c., of Murray & Mason, in whose house the accident occurred.

On the trial of the case, the jury rendered a verdict against the appellants for $5,000.

A motion was made for a new trial, and overruled.

The appellants insist this verdict is contrary to the evidence and the law of the case.

After a careful examination of all the evidence in the case, we can find no culpable neglect on the part of the appellants.

The deceased stated, immediately after he was brought up from the cellar where he was found, that he fell from the first floor, as testified to by two witnesses. The sliding bar across the mouth of the hatchway, which protected it on the first floor, was removed to enable the men to get the hogsheads of tobacco on the elevator which they were engaged in using, in hoisting the hogsheads from the first floor up on to the fourth floor. Having, and leaving, this bar drawn, while engaged in that work, is really all the negligence imputable to the appellants.

It is true, the appellants might have prevented this injury by the employment of an additional force, so as to have kept a guard by keeping a man stationed at the hatchway, for the express purpose of protecting other persons from injury; but the law imposes no such burden upon men's conduct of their ordinary private business upon their own premises. The occupant of a building is not held bound to insure the safety of persons who may come upon the premises. He is held to the use, not of the utmost, but only of reasonable care and caution, under the circumstances, to prevent others from receiving harm.

This hatchway was located some sixty-five or seventy feet back from the front of the building, where were situated the office and room, where others having business with the house transacted it; and was at a place where no one, except the inmates and employees of the house, had any business, and could not reasonably have been expected to be there, exposed to danger. Had the hatchway been at a place where persons were accustomed to pass and repass, or to be about, and their presence there ought to have been reasonably anticipated, a higher degree of care might have been exacted of the appellants.

We fail to discover from the evidence any want of ordinary care, a reasonable regard for the safety of others, and prudence, on the part of the appellants in their use and protection against danger, of this elevator and hatchway.

But the theory is advanced, that the deceased fell from the second floor, the evidence in support of which is claimed to be an appearance of injury about the waist, indicating the body had struck against some hard object in the fall, and which must have been the edge of the hatchway in the first floor, in falling from the second floor.

Opposed to this, is the probability that more extensive marks of injury would have been exhibited, had the fall been from the second floor; the possibility of striking upon the opposite side of the hatchway, even had the fall been from the first floor—the statement of the deceased himself, testified to by two witnesses, that he did fall from the first floor, and the fact testified to by a witness who saw it but a few minutes after the injury, that the protection was up around the hatchway on the second floor—the elevator was not being used from that floor. And had the fall been from the second floor, the evidence discloses no negligence, but on the contrary, care, in having the hatchway on that floor protected.

And while we fail to find any culpable negligence on the part of the appellants, was the deceased, himself, in the exercise of due care and caution at the time of receiving the injury? It does not appear the deceased had any proper business near

the hatchway. From the fact of his wagon being found standing loaded with kegs in front, it is supposed by the appellee he must have been in search of some one to assist him to unload, or of Burke, to get orders for the next day's packages.

There seems to have been no necessity to have assistance to unload. The receiving clerk, who attended to receiving and giving receipts for the kegs, testifies, that when not busy he frequently assisted in unloading, taking the kegs as they were tossed from the wagon, and that it was an accommodation to him, saving him one handling of them ; but that the deceased oftener unloaded without, than with any assistance. This clerk was at his place in the office in front of the building, as were others, but they saw nothing of the deceased that morning until after the injury. But if in search of assistance, he had passed by the door of the office in front, and was passing along back in the shipping room in 176, towards the hatchway ; he could not have stepped into the hatchway without going entirely outside of that room, a distance of the thickness of the partition wall. The opening in the wall there, was not used for passing from one building to the other over the elevator, when it was down, because it was surrounded on all sides by a railing.

If the deceased had been in quest of Burke, the usual and direct way was up the front stairs, from the shipping room to the second floor, then along south to the first archway, which communicated with Burke's room, and which was not so far south as the hatchway on the second floor.

The appellee's theory is, that the deceased passed by the front steps in the shipping room, which led up to Burke's room, along in the shipping room south some seventy-five feet, and past the hatchway to a back pair of stairs which led up to the second floor; that he went up those stairs on to the second floor, and then went back north on that floor to go to Burke's room, and walked through the first archway into the hatchway, by mistake for the next archway further on, which

communicated with Burke's room. This could not be considered the proper way to approach Burke's room, from the front of the building.

We have the statements of the deceased, that he had no business at the hatchway, and did not know what took him there.

The building is described as being very good as to light, and that it was so around this hatchway; a gas light was kept constantly in the basement underneath the hatchway, four to six feet from it, the flame of which was visible on approaching the hatchway from the front part of the buildings. The accident took place between nine and ten o'clock in the morning. Walking into and falling through this hatchway, under all these circumstances, is not reconcilable with the exercise of due care and caution on the part of the deceased, by the testimony in this case.

But it is urged that the testimony of the appellant's witnesses, as to the statements of the deceased, is unworthy of belief; that he was suffering from pain, and in agony, at the time they were made. The proof does not show his bodily or mental condition to have been such as to diminish, essentially, the credence to be given to whatever statements he did make. It is said they were improbable. They certainly were not so much so as to overcome the testimony of four unimpeached witnesses that they were made—the statements as to the hatchway.

Again, it is objected to them, as well as the rest of the witnesses for the appellants, that they were in the employment of the appellants. One of the two witnesses who testified to the statement of falling from the first floor, was not in their employ at the time of the trial. But the fact of being in such employment, would not justify the jury in discrediting them to the extent of rejecting their testimony entirely. *Chicago & Alton Railroad Co.* v. *Gretzner*, 46 Ill. 80.

The appellants' testimony is not to be done away with by these objections.

25—57TH ILL.

. We feel no hesitation in saying, that the verdict in this case is clearly against the evidence. The judgment must be reversed and the cause remanded.

. The appellants in this case have filed no abstract of the record, but have printed the whole testimony entire, as it was given, which is not in compliance with the rule. It is a great tax upon the time of the Court to search through such a voluminous mass of testimony, to find the material facts in the case. The costs of the so called abstract will be taxed against appellants.

*Judgment reversed.*