### BERLIN MILLS CO. v. CROTEAU.

(Circuit Court of Appeals, First Circuit. July 19, 1898.)

No. 212.

1. NEGLIGENCE—DANGEROUS MACHINERY OR PREMISES.

The requirements of reasonable foresight and reasonable precaution to prevent injury to another do not impose on an owner a duty to keep his premises or work in a suitable condition for those who come thereon solely for their own purposes, without any enticement, allurement, inducement, or express or implied assurance of safety. As to such persons the rules regulating the duty of a master to his servants do not apply.

2. SAME—PROXIMATE CAUSE.

A stranger went into a sawmill to collect money from one of the employés. To reach the employé, he walked along a railroad on a descending grade, down which cars were allowed to pass by their own momentum, and without a brake. As he approached the workman, the latter called to him to "look out"; and, without turning round to see what the danger was, he jumped between two cars standing on the track, and was injured by the descending car striking against them. If he had stood still, or moved in the opposite direction, he would have been safe. *Held*, that his misapprehension of the signal of the workman was the proximate cause of his injury, and the mill owner was not liable.

In Error to the Circuit Court of the United States for the District of New Hampshire.

Robert N. Chamberlin and Irving W. Drew (Merrill Shurtleff, on brief), for plaintiff in error.

Harry G. Sargent, William H. Paine, and Edward C. Niles, for defendant in error.

Before PUTNAM, Circuit Judge, and WEBB and BROWN, District Judges.

BROWN, District Judge. This is an action on the case by Albert Croteau against the Berlin Mills Company for personal injuries received through being crushed between two cars in the basement of the company's sawmill. Three car tracks in this basement were used for removing lumber and waste to the yard. From 350 to 450 car loads were removed each day. When empty, the cars were drawn by horses to a point in the yard where the grade of the tracks began to descend. The horses were then detached, and the cars allowed to run down the descending grade into the basement. The

cars were of smaller size than those ordinarily used on railroads. Croteau was not an employé of the company, but on the day of the accident went to the company's yard to see two workmen who were indebted to him, and who had previously promised to give him in payment orders upon the company for clapboards, to be delivered to Croteau and charged to the workmen.     Having procured from one of the workmen, whom he found in the yard, an oral order, which was accepted by the company's selling agent, Croteau, according to his testimony, said to the agent:

"'You wait for me here.   There is another man under the mill who owes me some money, and he told me he would give me an order the other day, and I would go for him;' and he said, 'All right.'"

Croteau then went to the mill, and walked down into the basement, upon the middle track.     Although it appears from the evidence that Croteau knew that the tracks were in use,—to some extent, at least,—he notified no one in charge of the cars that he was going under the mill, but walked on upon the middle track, into the basement, without looking behind him.     The mill was running, and there was considerable noise from the machinery and saws.     After going some 60 feet into the mill, he saw the man he sought, Valliere, working upon the further side of a car that stood on the track next to that on which Croteau had entered the mill.     On the track where Croteau was, there were no cars.     On the next track, at a distance of 4 or 5 feet from the car that was between Croteau and Valliere, stood a second car.     Croteau, upon seeing Valliere, made a signal to him signifying, "Come here."     At that moment four cars were coming down from the yard,—not upon the track where Croteau stood, but upon the next track, whereon stood the two cars, at a distance of 4 or 5 feet apart. Croteau's description of his conduct is as follows:

"* * * At the same time I was making him a sign to come here, they hollered. 'Look out, look out.'   Q. What did you do?   A. I ran between them two cars.   I didn't think them cars was going to move out of there, because they was half loaded.   I made a jump between those two cars there.   I thought, because they hollered out, something was coming on the track where I was.   If they didn't holler, I would be all right there. * * * I supposed, when they said, 'Look out,' there was a train coming on the track where I was. Q. And, instead of looking to see, you jumped right between the cars in front of you?   A. Yes, sir."

The descending cars struck the first standing car, and forced it against the second car, crushing Croteau's leg between the two cars so that amputation was necessary.

Although we are of the opinion that, upon the evidence of Croteau himself, he was guilty of such negligence as would preclude a recovery even had the company been negligent, we are also of the opinion that the company was guilty of no breach of duty to the plaintiff, and that the verdict holding the company liable was clearly unjustifiable. The errand which took Croteau under the mill was entirely his own, and had no connection with the business of the company.     While his presence in the yard to procure clapboards was possibly connected with the business of the company, his going under the mill was merely to collect a debt from Valliere.     This errand was no more the business of the company, than if he had gone under the mill to borrow

money of Valliere, instead of to collect a debt. So far as the company's business of selling clapboards afforded an invitation to come upon its premises, such invitation was restricted to the yard or office, and did not extend to the basement of the mill. The rule of law applicable to the present case is not, therefore, the broad and indefinite general proposition that, so far as there exist reasonable grounds for apprehending danger, a corresponding duty arises to take precautions. The cases furnish much more specific rules to aid owners of premises to understand their obligations. These specific rules are not inconsistent with, but are narrower than, that broad proposition. In Pol. Torts, pp. 36, 37, it is said:

"Now, a reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all," etc.

It is well settled that the requirements of reasonable foresight and reasonable precaution are not to be so extended as to impose upon an owner a duty to keep his premises or work in a suitable condition for those who come thereon solely for their own purposes, without any enticement, allurement, inducement, or express or implied assurance of safety. Sweeny v. Railroad Co., 10 Allen, 368, 372, 373; Beehler v. Daniels, 18 R. I. 563, 29 Atl. 6; Bigelow, Cas. Torts, p. 705. That a stranger, on his own business, may find his way into private premises or workshops, where hazardous business is conducted, is always a possibility; but the duty of vigilance to guard against injury therefrom is not cast upon the owner, but upon the intruder, who is bound at his peril to keep away from places or machines whereof he is ignorant, and who is not entitled to demand that business operations shall be conducted with regard to his presence or safety. While there may exist circumstances of an exceptional character in which an appearance of safety tends to lead or entice a trespasser or licensee into peril, so that the premises become a "trap" giving rise to a duty to take precaution for the safety of mere licensees, and even of trespassers, the present case is obviously not of that character. The nature of the work carried on by the company, and its cars, known by Croteau to be running at intervals, afforded a warning, instead of an assurance of safety. Such perils as arise from the ordinary use of the premises are not a trap. Redigan v. Railroad Co., 155 Mass. 44, 28 N. E. 1133. It is contended, however, that the company was guilty of negligence in running its cars without brakemen. But whether or not it was negligent towards those persons rightfully on or about its tracks is a question entirely distinct from that of its duty to Croteau. In determining whether the defendant is negligent, in a given case, his duty to the plaintiff at the time is to be considered, and not his general duty, or his duty to others. Fitzgerald v. Paper Co., 155 Mass. 155, 159, 29 N. E. 464. Employer and employed may consent to the adoption of methods which facilitate the work, though they increase the risk, and give rise to a necessity for extreme caution. These are matters to be regulated between master and servant. An inexperienced intruder cannot limit the master's right to use means that may be hazardous to those not familiar with the premises and

with the perils of the employment. June v. Railroad Co., 153 Mass. 79, 26 N. E. 238. The contention that the plaintiff's knowledge was of a safe method of running the cars (i. e. with brakemen), and that his reliance upon such knowledge in some way contributed to the injury, hardly requires consideration. The plaintiff did not jump upon the track where he was injured for the reason that he supposed that the cars on that track would be stopped or regulated, but because of a belief that no cars would come upon that track. Had he known that cars were coming upon that track, it certainly would have been gross negligence for him to have stood on the track upon which they were coming, relying upon their being so controlled by the brakeman that they would not injure him. The evidence in the case does not justify an assumption that, if the cars had been braked, the plaintiff would have escaped injury. The proximate cause of the injury was, in our opinion, the plaintiff's misunderstanding of the signals. Warned by the cries which were intended to prevent him from going upon the track, he misunderstood the warning, and, without stopping to look, made a mistaken choice of a place of refuge; relying upon his belief that, because the two cars between which he was crushed were half loaded, no more cars would be sent upon that track. He reversed the meaning of the signal, and thereby was led to leave a position of safety, and place himself in danger. The defendant cannot reasonably be held to a duty to have foreseen or guarded against an occurrence of this character. The misapprehension of signals must therefore be considered an intermediate cause, disconnected from any fault in the management of the speed of the cars, if such fault existed, and in legal contemplation the proximate cause of the injury. Railway Co. v. Kellogg, 94 U. S. 469; Scheffer v. Railroad Co., 105 U. S. 249. The injury therefore was the result of an accident for which the company was not responsible. The judgment of the circuit court is reversed, and the case remanded to that court, with directions to set aside the verdict, and to take further proceedings not inconsistent with our opinion passed down this day; and the plaintiff in error will recover its costs in this court.