---

THE IOWA.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1914.)

No. 1176.

1. SHIPPING (§ 80*)—LIABILITY OF VESSELS—INJURY TO LICENSEE ON BOARD.

Libelant, who had business with an officer of a steamship to which he had sold supplies and which was loading lumber at a pier, went on board from the pier in the daytime when the loading was in progress and started to walk along the deck between the open hatchway through which the lumber was being passed and the side next the pier, when he was struck by a sling of lumber coming over the side and knocked into the hatchway and injured. The vessel was properly constructed, equipped, and manned. The loading operations were in plain sight and the danger was obvious. Libelant could have passed to the other side of the hatch and proceeded in safety, and there was evidence that he was repeatedly called to by the stevedores and warned. *Held,* that he assumed the risk and could not recover from the vessel for his injury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 335, 341, 352; Dec. Dig. § 80.*]

2. SHIPPING (§ 80*)—LIABILITY OF VESSELS—DANGEROUS CONDITIONS—OPEN HATCHWAYS.

That the hatchways of a ship, when in port and at a loading berth, are open and unguarded except by the usual coamings, is not an evidence of negligence on the part of the ship, but a usual condition which is to be expected, and any one going on board, although lawfully there, is required to take notice of such condition and avoid injury therefrom.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 335, 341, 352; Dec. Dig. § 80.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in admiralty by M. Snider against the steamship Iowa; S. E. Adams, master and claimant. Decree for respondent, and libelant appeals. Affirmed.

This is a libel in rem against the steamship Iowa for personal injuries sustained by appellant on account of the alleged negligence of the officers of the vessel in causing a draft of lumber to be swung suddenly over the side of the vessel, striking the appellant and throwing him down hatch No. 5, by reason whereof he sustained the injuries upon which this suit is based.

Among other things it is alleged that in response to a letter written by the chief officer of the Iowa, on the 21st day of May, 1912, the appellant proceeded to the pier of the Norfolk & Western Railway, known as the Merchandise Pier, at Lamberts Point, to board the vessel, and in company with one John Zimmerman boarded the vessel by means of a ladder which was extended from the pier to the deck of the ship; and that the said vessel was then being laden with lumber which was lowered into the hold of the vessel by means of a fall and tackle and by other means.

Appellant also alleges that when he reached the deck he was directed by the chief officer of the vessel to come to the cabin of said chief officer; that he boarded the vessel on the port side thereof, which was the side of the vessel lying next to the Merchandise Pier, and in obedience to the direction of the chief officer proceeded to walk along the deck on the port side thereof towards the chief officer who was standing near his, the chief officer's, cabin; and that while on the deck of the vessel as aforesaid the chief officer, servants, and agents thereof negligently, carelessly, and improperly caused to be swung over the side of the vessel a large piece of timber or lumber against appellant, whereby he was violently struck by said timber and thrown for a distance of about 30 feet into the hold of the vessel and was greatly injured, crippled, and wounded without any fault on his part.

Appellee and claimant in his answer denies that appellant was on board at his invitation, or that his injury was due to the carelessness or negligence of his agent, employés, officers, or otherwise, but through the fault and negligence of the appellant himself. And also further denies the material allegations of the complaint and says, among other things, that the appellant was not invited by the chief officer of the ship to walk in the direction he did on this occasion, as alleged in the libel, and that the accident was not caused by any want of ordinary care on the part of himself or the chief officer, and also denies that the said officer himself failed to exercise such care in any respect whereby said appellant received the injuries complained of.

Further answering, respondent says: "That the steamship Iowa is a British steamship of the burden of 5,360 tons net, 500 feet long, 58 feet beam, 37 feet deep, with twin screws, triple expansion engines, constructed of steel, only ten years old and strong, properly equipped and provided with all proper, necessary, and modern appliances for operation as a freight carrying ocean steamship, and provided and manned with a skillful and competent crew of officers and men, under the command of this respondent. That said steamship, prior to the date of the accident, had arrived at the port of Norfolk for the purpose of completing her cargo and had engaged the services of one William E. Dillion, a competent stevedore of experience and repute, to take on the portion of cargo of lumber that was being handled at the time when appellant received his injuries, said Dillion being engaged as an independent contractor; he to furnish all labor and to have entire conduct and charge of said operations and the laborers engaged therein, the steamship to furnish only the gear, the winch, and the steam, and her officers having no duty nor responsibility connected therewith, save to see the cargo properly stowed after being placed in the hold. That Dillion engaged his gangs of stevedores and set them to work on the 21st day of May, 1912, said work being carried on in the usual way, the manner, and dangers of which were well known to the appellant and open and obvious to every one. That notices were also posted at all entrances leading to the deck of the ship, warning persons not to come on board without an order.

"Said libelant, on the morning of the accident, under the circumstances aforesaid, recklessly and carelessly ventured upon the deck of said steamship between the incoming loaded sling and the hatch No. 5, taking his position near said hatch and despite several warnings given him by the employés of the stevedore, Dillion, carelessly and recklessly remained in said position until the loaded sling came in contact with him, striking him with little force, but sufficiently to cause him to fall over into the open hatch, down which he fell a distance of only eight feet, being caught by one of the stevedores as he fell."

As a further defense respondent says: "That if, however, the injury was caused in any manner or to any extent by negligence or want of care on the part of any one other than the libelant himself, such negligence or want of care was not on the part of the steamship, or her officers or employés, but, if it existed at all, which this respondent denies, it existed on the part of William E. Dillion, his servants, agents, and employés, who was an independent contractor and upon him was the entire responsibility, as has heretofore been set forth."

The libel was filed in the lower court on May 22, and came on for hearing before the district judge on March 27, 1913. All the eyewitnesses of the accident were examined in the presence of the district judge, and a decree was entered on January 25, 1913, in which the lower court held that the appellant was not entitled to recover against the steamship, from which decree this appeal was taken.

S. M. Brandt, of Norfolk, Va., for appellant.

Floyd Hughes, of Norfolk, Va. (Hughes & Vandeventer, of Norfolk, Va., on the brief), for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). · It is contended by counsel for appellant that there were no findings of fact by the court below, and therefore the rule that the decree of the trial judge will not be disturbed upon mere questions of fact depending upon the credibility of witnesses who testified before him, unless there be found a decided preponderance of evidence against the same, does not apply in this instance.

[1] Appellant insists that he was invited on board the ship and directed to pass along the port side of the deck, and that thereby the owner assumed the obligation that the same was in a safe condition and suitable for use; that, where one invites another upon his premises for any purpose he must exercise ordinary care to render the premises reasonably safe for the visit. In support of his contention, appellant testified that he lives at Lamberts Point and sells merchandise to ships; that he received a note from the chief officer of the Iowa as shown in the statement of facts; that in response to said note, on the morning of May 21, he went on board the ship accompanied by a colored man named Zimmerman; that this was his first order from the steamer; that when he went on the gangway the colored man went in front with his bag of merchandise, and witness went to the front of the steamer and stopped to see which way to go; that he did not see anybody there; that in the meantime the chief officer had seen witness and called to him and said, "Snider, come up straight to me, come up to me;" that the chief officer was only 20 or 25 feet away when he said, "Snider, come up straight to me;" that he was on the side of the ship nearest to the pier, which was the side of the ship that was tied

up to the pier; that there was nothing in front of witness; that he went along the side of the ship close to the dock; that, when witness started across to where the chief officer was standing, it was a clear passageway that he saw; that he did not hear anybody "holler" at him; that Mr. Dillion did not call to him; that he had never seen Dillion until he came to the court; that the colored man, Zimmerman, was a little behind him; and that all he remembered was that when passing close to the hold he was struck with a sling of lumber on his left side; that the lumber was coming from the pier on the port side; that he saw no lumber on the pier when he got on the ship; that there was "hollering," but witness was so excited that he did not know anything about who did it; that he saw people working on the other side of the ship, a majority of whom were colored; that if anybody called or said anything of danger he would not have gone there; that there was nothing there to warn him; that if there had been he would not have walked there; that he did not see lumber before it struck him; and that just as it passed him, he was struck and knocked straight into the hold.

On cross-examination witness stated that he was conducting a ship chandlery business; that he was building up business mostly on barges; that he never had an order from this steamer before; that he went on board to solicit business the day before the accident, but that the cargo was not yet stowed in the hold; that he went down on the morning of the accident and saw persons working in the back part, but not in the front part; that they were working at all the hatches he saw; that witness was in such a hurry to get to the chief officer that he did not notice at all how things were; that Mr. Dillion did not "holler" at witness nor curse him nor tell him to get out of the way; that if Mr. Dillion had done so he would not have walked there.

John Zimmerman, who accompanied appellant for the purpose of carrying a bag of merchandise for the ship, testified on behalf of appellant that when he got on board the ship appellant was coming behind; that they were both on the port side; that appellant was looking back on the stern of the ship and then turned and looked at the bow and motioned for him to come up; that he thought it was one of the officers that motioned to appellant; heard nothing said, but saw the motion made. Appellant directed him to take the bag of merchandise, and that he put it on his shoulder and turned around and saw the pile of lumber and "hollered" at appellant, but that appellant could not get out of the way. He said that appellant could have got out of the way, he supposed, if they had not frightened him so by "hollering"; that, after he "hollered," all the rest "hollered" at him; that the draft of lumber struck him on the right side; that when he "hollered" the winch was dragging on the ship to the hatch; it was going as fast as it could go dragging along.

Shadrack Clayton testified that he was a longshoreman and stevedore, and worked for Mr. Dillion; that he was at hatch No. 5; that he was working in the hold of the vessel; that No. 5 hatch was being brought to the cattle deck; that he had just made ready to knock the hatch off, and heard some one make a noise; that he looked up and thought it was a bale of cotton until he got to it and found that a man had come

down; that the man fell directly in the hatch on the scantling stuff that witness was handling; that they stopped work to get him out, and would have stopped to put on the hatches. This is the evidence offered in chief by appellant.

Respondent introduced a number of witnesses, the first one being W. H. Chapman, chief officer of the ship, who testified that he was on duty the day the accident occurred; that the vessel carries no passengers, but fitted first class; that it has modern gear; that it is a roomy ship about the deck; that it has more room than most ships, because of the small hatches; that witness met appellant a day or two before the accident occurred at Lamberts Point; that he had authorized members of crew to get what they wanted from appellant and he would settle the bill; that a representative from the store visited the ship, but he cannot say whether it was appellant or Alberts; that it was agreed that certain articles of merchandise were to be delivered on board the ship; that on the morning of the accident witness was standing on the port side of the ship when he saw appellant somewhere about the bottom of the gangway. The ship was loading with lumber at hatch No. 5; the stevedores were engaged in taking lumber on the side of the ship; that there was no difficulty about a person's standing on deck seeing the operation, and slings coming over and going into the hatch; there being no obstruction to the view; that when he saw appellant at the foot of the ladder he started to his room to get papers all ready for him and the money; that the next thing that called his attention to appellant was just as he was getting to the entrance of his room he heard a noise or shout and turned around and saw appellant in the act of getting pushed over the hatch; at that time witness' back would be to the hatch and appellant; that appellant in passing on the fore part of the hatch his side was to the hatch and his back would be to the ship's side; that he had not seen appellant from the time he saw him at the foot of the ladder until he heard the shout which caused him to turn around; that he was then just in the act of being pushed from the hatch; that he does not know where appellant was standing; that he was on the after port side of the hatch and in the act of falling in the hatch; that witness saw him fall; that he gave no directions or signs or indications to appellant on the morning of the accident as to what part of the deck he should pass over; that the hatch is about 13 feet square, or, rather, 13 by 16 feet; the coamings of the hatch about 1 foot 9 inches on the sides and 2 feet in the amidships, and they slope a little towards the sides; that from the port side of the hatch to the port side of the ship is about 19 feet 6 inches; that when accident happened nothing went wrong with ship's gear or machinery so far as he knew; that none of the crew had any connection with loading the cargo at hatch No. 5; that where one with business in the mate's room lands on the deck of the ship when the vessel has her port side to the wharf and taking cargo from the wharf into hatch No. 5, according to the usual custom such person should go along the deck on the side where the cargo is not working whether they have to cross the deck or otherwise; that the danger of attempting to go along the port side of the deck to witness' room is that cargo is coming across the deck; that in loading

cargo like that there is always a man attending to the cargo; that the cargo would be coming in on the left side of the vessel, and a man going down on the port side, whether he would be going between the loaded sling and the hatch depends on whether the sling was close to the hatch or close to the ship's side.

On cross-examination witness stated that he was sure that he did not call appellant when he saw him at the bottom of the ladder; that he did not tell Hickman that he had called appellant; that he did not tell Mr. Albert that he called appellant and that he got hurt on that account; that he did write Mr. Snider a letter requesting him to come on board the ship on the morning of the 21st, not later than 8 o'clock; that the ladder was the only means provided for a person to get into that vessel; that if a person alighted from the ladder, immediately upon getting aboard the vessel on the port side, he would have to walk to get to the passageway leading to the witness' room by the nearest way from 30 to 35 feet; that a person of appellant's build, he supposes, could have walked it in about half a minute; that he could not say on this particular day how the winch was being driven, slowly or fast; that it was driven in the usual way so far as he knew; that, if he had called appellant when he came aboard on the port side of the vessel, the shortest route for him to take would be to continue on the port side of the vessel to the passageway leading to his cabin; that he would not think that appellant would attempt to cross where the work was all the time; that when the sling was at the pier, and had not reached the point where it was even with the rail, a man alighting from the ladder on the port side of the vessel, when he got on the deck, could see over the side of the vessel from where he was standing and see the sling; that the rail is about three feet six inches high; that witness cannot say that he warned appellant nor that any of ship's crew warned him; that this vessel was laden very much the same as every other vessel; that there are different ways in different ports, but the same machinery, the same mode, and the same kind of gear.

Samuel Creighton, gangwayman, testified that he was at No. 5 hatch on the morning the appellant was hurt; that just as the draft landed on the deck he saw appellant coming between hatch No. 5 and 6 and warned him to stop and not come there; and that when he was just opposite the hatch he warned him not to come; that he was at the tail end of the draft; that the man steadied the draft and just as the witness got there the draft struck him and overbalanced him; witness said he heard others "holler" at him and that he bore his weight down on the tail end of the draft "so as to keep it from hitting appellant with the force it was swinging."

Witness N. Farrow testified that he was at hatch No. 5 on the morning of the accident; that he gave the signal to go ahead as the draft came over the side, and, when it was clear in order that it might drag across the deck, he signaled to shut off the steam; that the sling was in plain view coming over the side when he first saw appellant about 10 feet from the hatch. Witness also corroborated the statement of witness Creighton to the effect that Dillion and others notified appellant of his danger. Also, stated that he did not see the chief

officer make any motions to him, and that if the chief officer had made any motions he could have seen the same as he was in a position to see what the chief officer was doing at that time.

On cross-examination witness stated that when the appellant was hurt he saw the mate somewhere forward of hatch No. 5 on the port side of the vessel; that he did not know that he went inside; did not see or hear him call appellant; he was right before witness' eyes; witness knows he did not call appellant to him and did not motion to him.

Witness S. E. Adams, master of the ship, testified that the ship was a modern vessel in every sense of the word; that the stevedore had full charge of discharging and loading the ship. He also testified that the stevedore furnished all hands and that the ship furnished steam, winches, and the cargo gear—the falls and blocks; the steamship, power and gear, and the stevedore, the labor; that the stevedore had charge and direction of the operations of the gangs of stevedores and the operation of machinery; that witness was on the ship at the time of the accident, but cannot say that he was on the deck at that particular time; that the work was being carried on in the usual way; that one having business with the mate and having come up the ladder, as in this instance, should immediately go right across the ship's deck, where there is a free passageway and proceed on the starboard side, thus keeping away from the material that is being loaded; that there was nothing in the situation of the ship or its surroundings to obstruct the view of any one on the ship or walking on its deck, and that the slings and hatches were in plain view.

On cross-examination witness testified, among other things, that the ship carries a donkeyman as a part of the crew to keep steam for the winches; his duty is separate and distinct from the duty performed by a fireman or engineer; winches are used entirely for loading vessels; the donkeyman is down below firing coal to the boiler to provide steam for the winches; the winch is the moving power; they have a mast and derrick, and the fall goes from the winch to the derrick, and then down; hold No. 5 is just a little forward of amidships toward the bow. That notice is put there as a general warning to any and every one, and is always hung out at the gangway in every port and place the boat goes as a general reminder to every one that comes there to beware; that witness did not mean to say that appellant had no right to go on the ship.

Witness Dillion testified that he loaded the steamship Iowa, and that the officers had nothing to do with it; that he was acquainted with Mr. Farrow, the winchman, for about two and one-half years, and that he was a very capable man; that Creighton, the gang tender, was all right; that witness had known him six or seven years; that he is an experienced man; that a man named Ned Bland was gang tender that morning, but asked Creighton to take his place; that on the morning of the accident he was on the cattle deck; that the men were working; that he started up the ladder and was about to the top of it when his attention was directed, and looking over his shoulder saw appellant about five feet abaft of the hatch; that he "hollered" at the man not to come up to the coamings, to stay back or he would get hurt; that wit-

ness then climbed over the coaming and walked to the port side of hatch No. 5; that he "hollered" and shouted at appellant and did everything in his power to keep him out of danger; that appellant paid no attention and walked directly into the draft; that if appellant had stopped when he first "hollered," and not continued on, that he would not have been hurt at all; that he believes that the winchman "hollered," Smith "hollered," and the man at the gangway "hollered"; everybody shouted trying to get the man out of the way; that there was nothing the winchman could have done to stop the sling after it came over the ship's rail; nothing more than he did do; and that the gang tender could not have done anything to stop the draft but to throw himself in and try to hold it.

Cornelius Smith testified that he had had 27 years' experience as stevedore; that for the last year or two had been attending gangway; that he was at hatch No. 5 as gangway tender on the day of accident; that vessel was taking cargo and that they had two more drafts of lumber; that he saw appellant come up the ladder and go on the deck accompanied by a colored man; that appellant asked, "Where is the mate?" that the mate was coming forward across the end of No. 5 hatch to his quarters, and witness said, "There he is now;" that appellant started over in a rush and witness said to him, "Be careful if you are going that way;" that appellant looked around again and stopped about half way between there and the other hatch; that Mr. Dillion "hollered," "Stop! You want to get killed!" and that the winchman stopped the winch, and appellant went towards the colored man in a half twisted manner; that there was a draft coming and he took two of three steps towards draft and that it pushed him right off; that the drag was coming by its own weight into the ship; that the winchman cut off the steam as the draft came over the ship; that the sling was handled as usual; that Mr. Dillion cursed the appellant who was standing about seven or eight feet from the draft at the time, and it looked at that time as if he was going to walk in front of it after Mr. Dillion "hollered"; that he saw the chief officer after appellant got on the deck walking towards his quarters; that he was in a position to see if the chief officer spoke to him; and that he did not speak to him nor did he see the chief officer make any motions towards him; that he pointed out the chief officer to appellant and then turned around, and if he "hollered" then, he didn't know anything about it; that he told appellant when he came on the deck that he had better be careful or he would be hit by something flying around there.

Appellant was recalled by his counsel and in reply to the testimony of Smith, who had testified that he had told witness to be careful and not to walk up that way, that he was liable to get hurt, stated that he did not see anybody; that nobody spoke to him; that witness did not have time to speak to him, and does not know that Mr. Dillion "hollered" at him, or that anybody was "hollering" at him; that he does not drink and was not drunk that day; that he did not see any danger, and that he would not have walked into it and got killed; that there was nothing swinging in front of him when he started across; it was just as clean as the floor of the courtroom.

From the foregoing it will be seen that there is a sharp conflict of evidence between appellee and the witnesses on behalf of appellant.

The principal facts relied upon by appellant to support his contention are:

(a) That when he went aboard the ship just before the accident it was in response to an invitation contained in a letter from the chief officer of May 21, 1912.

(b) That when he reached the deck of the ship he went to the front of the steamer and stopped to see which way to go; that he did not see anybody there; that in the meantime the chief officer had seen witness and called to him and said, "Snider, come up straight to me, come up to me;" that he had boarded the vessel on the port side and in obedience to the direction of the chief officer proceeded to walk along that side of the vessel towards the chief officer, who was standing at the time near his, the chief officer's, cabin; and that under these circumstances he was justified in assuming that the passage on that side of the vessel was unobstructed and free from danger.

It is contended by counsel for appellant that:

"When the ship's officers invited him aboard, they assumed the obligation that the ship was in a safe condition, suitable for the use that they induced appellant to make of the ship."

It is urged by counsel that appellant is corroborated by witness Zimmerman. While Zimmerman said that he saw some one motion to appellant, yet he did not know who it was, nor did he hear any directions given to appellant by any one at that time. This is the only testimony presented to corroborate the evidence offered by appellant as to what occurred on board the ship just prior to the accident. While, on the other hand, Zimmerman corroborates the witnesses who testified that a number of parties on the ship called to appellant and notified him of his danger.

The appellant is flatly contradicted by the chief officer, who says that when he saw appellant at the foot of the ladder he went to his room to get the papers and money with which to make a settlement, and that the next he saw of appellant was just at the time he was going to enter his room; that he heard a noise on the ship and turned around and saw appellant in the act of getting pushed over the hatch; that he gave no directions to appellant or any signs or indications as to where he should walk on that occasion.

Smith, the gangtender at No. 6 hatch, stated he was standing near appellant when he first landed on the ship's deck, and that appellant asked him where the mate was, and he pointed out the chief officer as he was going across forward hatch No. 5, going to his quarters, and that appellant started over in a rush, when the witness said, "Be careful, if you are going that way, you will be hit by a sling." He also testified that Mr. Dillion and others were "hollering" at appellant, and warning him of the danger. In fact, a number of witnesses, who were working in and about the hatches, stated positively that appellant was repeatedly warned as to the dangerous situation which confronted him, thus corroborating the chief officer to the effect that he did not call appellant or give him any directions as to where he should go.

Farrow, the winchman, states that he was in a position to see what the chief officer was doing, and that he did not see the chief officer make any motions to appellant, nor did he hear any conversation between him and appellant; that he saw the chief officer go off toward the hatch in the direction of his room. This witness also corroborates the chief officer, and there were other witnesses who corroborated him as to what occurred between him and appellant on that occasion.

It appears from the testimony of a number of witnesses that the danger was open and obvious, and that one in the position of appellant, after he went aboard the ship, could not avoid observing the true situation.

The appellant, according to his own testimony, had been a ship chandler for more than a year prior to the accident, engaged in selling different articles of merchandise to ships. It also appears that he had gone on board this ship the day before for the purpose of soliciting orders.

Appellant, residing as he did in a community where ships were constantly coming in and going out, had every opportunity of observing the construction of ships as well as the method by which they were loaded and unloaded, and he must have had knowledge as to the location of the hatches and the condition of the same when a vessel is being loaded as on this occasion. It is inconceivable that one boarding the ship by means of a ladder on the port side at a time when it was being loaded with lumber as on this occasion should have failed to observe the operations incident thereto.

As we have stated, the court below made no specific findings of fact, yet it is presumable that the court considered and passed upon this question and was of the opinion that appellant had not established his contention, as respects this point, by a preponderance of evidence. Be that as it may, we think that the greater weight of the evidence is to the effect that appellant for some inexplicable reason elected to walk along the port side of the ship, notwithstanding the dangers which confronted him, rather than walk across the ship and then along the starboard side where there was no danger or obstruction. In other words, we do not think that appellant has shown by a preponderance of the evidence that he was induced to walk along the port side of the ship by the carelessness or negligence of the owner, its officers, or any of its servants.

It clearly appears that when appellant reached the deck of the ship, he was in a place of safety, and in addition thereto, he was repeatedly warned by those who were standing near him that it would be dangerous to attempt to go along the port side. According to the undisputed testimony of many of the witnesses, he could have passed in safety on the starboard side of the ship; but he failed to heed the warning that was given him in time to avoid being struck by the sling of lumber.

[2] In the case of Elder Dempster Shipping Co. v. Pouppirt, 125 Fed. 732, 60 C. C. A. 500, decided by this court, the third syllabus is as follows:

"A passenger who voluntarily leaves a place of safety on a ship without necessity, and goes to a part of the ship where there is danger, of which he

has knowledge, or which is obvious, assumes the increased risk therefrom, and he cannot recover from the ship or its owners for an injury so received because he was not given warning, which, under such circumstances, was unnecessary."

While the appellant had a right to be on board the ship and go from one point to another, yet he was not justified in assuming that all the hatches would be closed and the passageway unobstructed, in view of the fact that the ship was being loaded preparatory to its departure, and this would be true if it had not been shown that he was warned of the danger and advised not to attempt to reach the cabin on the port side of the ship. It is a matter of common knowledge that hatches are an essential part of a ship, and from the evidence in this case we must infer that appellant was fully informed as to this fact.

In the case of Dwyer v. National S. S. Co. (C. C.) 4 Fed. 493, Benedict, District Judge, said:

"Hatchways are well-known features and sources of dangers on a ship. They are intended to be open a large portion of the time, especially when in port, not only for the purposes of loading and unloading cargo, but also for ventilation. An open hatchway on a ship, when provided with the usual coamings, is not evidence of a neglect of duty on the part of the shipowner. On the contrary, a shipowner has the right to allow the hatchways of his ship to remain uncovered and unprotected, except by the usual coamings; and all persons moving upon the decks of a ship are chargeable with notice of the probable presence of open hatchways on the deck. Neither is it the duty of the shipowner to maintain a guard stationed at the hatchway of his ship for the purpose of protecting persons from injury by falling into it. Such a duty would be burdensome in the extreme, and is not required by the law. Murray v. McLean, 57 Ill. 378. The requirement would be unreasonable, has never been observed in practice, nor, so far as I know, declared in any adjudicated case.

"The case cited, where the injury arose from defective machinery, afford no support to the position taken by the plaintiff, because here there is no pretense that the injury arose from any defect, weakness, or faulty construction of the grating. The cases cited, declaring a liability for injury arising from holes in thoroughfares, improperly protected holes in floors, and the like, are equally inapplicable here. The deck of a steamer is not a highway, and is a place where open hatchways must be maintained, and therefore are to be expected and avoided."

As is shown by the statement of facts, the vessel in question is a British steamship, of 5,360 tons burden, 500 feet long, 58 feet beam, 37 feet deep, with twin screws, triple expansion engines, constructed of steel, properly equipped with all proper, necessary, and modern appliances for operation as a freight carrying ocean steamship, and manned by a skillful and competent crew of officers and men.

There is no evidence to indicate that that portion of the ship over which appellant attempted to cross was defective, or that appellee had been negligent in the construction thereof.

The owner of a vessel of this kind must exercise reasonable care for the safety and protection of such persons as he may expect to come on board for any legitimate purpose, in keeping the passageways of the same in a reasonably safe condition. He must exercise such care as a reasonably prudent man would under similar conditions; but while this is so, he is not required to anticipate that persons boarding

the vessel for the transaction of business with the ship or otherwise, will assume risks where the danger is open and obvious and such as is essentially incident to the proper conduct of the business of the ship. The opening of hatches for the purpose of loading and unloading freight is as essential to the transaction of the business in which the ship is engaged as the operation of any part of the machinery of the vessel, and therefore a ship cannot be held guilty of negligence in opening its hatches for such purposes nor in loading lumber in the manner it did on the occasion in question.

A careful consideration of all the evidence in this cause impels us to the conclusion that the lower court did not err in entering the decree of which appellant complains.

It necessarily follows that the same should be affirmed.

Affirmed.