### JONES v. CLINCHFIELD NAV. CO.

(Circuit Court of Appeals, Fourth Circuit. October 21, 1922.)

No. 1969.

Shipping ☞86(2)—Evidence in action for death resulting from fall through hatch held to authorize nonsuit.

Evidence in a death action that decedent went on board a ship in port at night, unannounced and uninvited, and while wandering around in the darkness was killed by falling through an open hatch, held to authorize a nonsuit.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Action at law by Katie M. Jones, as administratrix of the estate of Arthur P. Jones, deceased, against the Clinchfield Navigation Company. From a judgment granting a nonsuit, plaintiff brings error. Affirmed.

John I. Cosgrove, of Charleston, S. C. (Logan & Grace, of Charleston, S. C., on the brief), for plaintiff in error.

W. C. Miller, of Charleston, S. C. (Miller, Huger, Wilbur & Miller, of Charleston, S. C., on the brief), for defendant in error.

Before KNAPP, WOODS, and WADDILL, Circuit Judges.

KNAPP, Circuit Judge. On the night of January 22, 1920, the steamship Saxon, owned and operated by defendant, was lying at anchor in the Cooper river about three-quarters of a mile from the city of Charleston. She was employed in carrying coal to Havanna, Cuba, and had returned from that port for another cargo two days before. She was prepared to take it on board, and expected for that purpose to go to the coal chute the next morning. All her hatches were open, the wireless aerials down, and the booms up. One of the hatches left open was the bunker hatch on the poop deck. The poop deck is in the after part of the vessel some 8 feet above the main deck, from which it is reached at the forward end by two flights of steps, one on each side of the ship. Upon this deck is a "house" which contains

the engineers' quarters. In front of the house is the bunker hatch, about 5 feet square, with combings 20 inches at the center and 19 inches at the edges. Between the house and the hatch is a space of thirty-four inches, and between the hatch and the rail of the ship on either side a space of 8 feet. The officers' quarters are on another deck amidships, about 100 feet forward of the poop deck and at the same elevation above the main deck.

The Saxon was one of a line of ships running between Charleston and other ports, and defendant maintained an office in that city with a resident or port captain in charge, one Bayliss, who hired officers and crews for its various vessels.

Plaintiff's intestate, Arthur P. Jones, was a licensed shipping master, commonly called ship's "runner"; that is, he procured sailors for ships arriving at Charleston and in need of men. He had some arrangement or understanding with Bayliss by which he got $2.50 for each man furnished by him for defendant's ships. It appears that ship's runners were accustomed at reasonable hours to board vessels in the port of Charleston for the purpose of learning whether men were needed, and, if so, to solicit the business of supplying them. In the case of vessels having no resident representative, the business was transacted with the officers in charge.

A steam fitter in the employ of a Charleston shipyard; who had been engaged in running a pipe line on the Saxon, testified that on the night in question, between 8 and 9 o'clock, Jones came on board just as he was leaving, and asked him if he had seen the mate; that he told Jones he had seen the mate aft "awhile ago," but did not know where he was; that Jones started aft, and he got into his launch and left the ship; that the night was dark, and there was no watchman at the gangway. The second officer of the Saxon testified to what happened as follows:

"Well, I was just walking aft on the port side of the main deck and up the gangway to the poop deck. Just as I stepped on the poop, this man—I didn't know who it was then—turned the starboard corner of the house. I could just see an object, because it was dark and foggy; and I heard his feet hit something, and I missed him. Of course I knew the hatch was open, because it is most always open, especially in port.

"Court: He had gone up the companionway to the poop? A. He was on the poop, yes, sir; but evidently he had been around that house on the portway, all around way aft, and was coming forward on the starboard side."

Jones was killed by the fall, and this suit was afterwards brought to recover damages for causing his death, on the theory that defendant was negligent in leaving the hatch through which he fell open and unlighted. At the conclusion of plaintiff's testimony the trial court granted defendant's motion for a nonsuit, and the case comes here on assignments of error.

It is rather difficult to believe that Jones went out to the Saxon that evening on a legitimate errand. He went alone, in a launch without lights, after 8 o'clock, on a dark and foggy night in midwinter. He was not heard to hail the ship as he drew alongside, and he boarded her without permission. He had been in Charleston most of the day, having come from Columbia that morning, and could easily have ascertained from Bayliss whether or not she was in need of any men.

He was presumably familiar with the movements of defendant's ships in that port, and must have known that the Saxon would not sail until she had taken on her cargo at the coal chute, where her officers could have been seen in the daytime. In short, it seems evident that he had no occasion to visit her on the business of a ship's runner at the time and in the manner shown by the testimony.

But granting that Jones was not a trespasser, he was at most a mere licensee, to whom, in the circumstances here disclosed, defendant owed no duty which it failed to discharge. The ship had been prepared for loading with coal, and her hatches opened for that purpose, as was customary and proper in such case. She was riding at anchor, engaged in no work, not in communication with the shore, waiting for the morning to go to her place of loading. That any stranger, even a ship's runner, should come on board at such an unusual hour, without notice to or consent of the officer in charge, was so improbable as not reasonably to be taken into account. And if Jones undertook to do so, unannounced and uninvited, and then went wandering around in the darkness of night, without calling out or otherwise making his presence known, he assumed all the risk of his adventure.

The governing rule of law is put beyond doubt by numerous decisions. In Berlin Mills Co. v. Croteau, 88 Fed. 860, 32 C. C. A. 126, it is stated as follows:

"That a stranger, on his own business, may find his way into private premises or workshops, where hazardous business is conducted, is always a possibility; but the duty of vigilance to guard against injury therefrom is not cast upon the owner, but upon the intruder, who is bound at his peril to keep away from places or machines whereof he is ignorant, and who is not entitled to demand that business operations shall be conducted with regard to his presence or safety."

And the further observation of the court in that case is peculiarly applicable:

"While there may exist circumstances of an exceptional character in which an appearance of safety tends to lead or entice a trespasser or licensee into peril, so that the premises become a 'trap' giving rise to a duty to take precaution for the safety of mere licensees, and even of trespassers, the present case is obviously not of that character."

In 24 R. C. L. 1217, the rule is thus stated:

"But the mere leaving open of a common hatchway or other usual aperture while the vessel is lying in port, in accordance with the general custom in this particular, is not of itself negligence, particularly as regards a person, who, from his experiences with ships, is familiar with the custom and knows that the hatchways are sources of danger which he must avoid at his peril."

Directly in point, and relating to facts more favorable to the plaintiff than are those at bar, is the following from Dwyer v. National S. S. Co. (C. C.) 4 Fed. 493:

"But I cannot agree to the proposition that it was part of the defendant's duty to maintain a safe covering upon this hatchway. Hatchways are well-known features and sources of dangers on a ship. They are intended to be open a large portion of the time, especially when in port, not only for the purpose of loading and unloading cargo, but also for ventilation. An open hatchway on a ship, when provided with the usual combings, is not evidence of a neglect of duty on the part of the ship owner. On the contrary, a ship

owner has the right to allow the hatchways of his ship to remain uncovered and unprotected, except by the usual combings; and all persons moving upon the decks of a ship are chargeable with notice of the probable presence of open hatchways on the deck. Neither is it the duty of the ship owner to maintain a guard stationed at the hatchway of his ship for the purpose of protecting persons from injury by falling into it. Such a duty would be burdensome in the extreme, and is not required by law. * * * The requirement would be unreasonable, has never been observed in practice, nor, so far as I know, declared in any adjudicated case."

Among other cases of like import are the Germania, Fed. Cas. No. 5,360; The Gladiolus (D. C.) 21 Fed. 417; The Sir Garnet Wolseley (D. C.) 41 Fed. 896; The Jersey City (D. C.) 46 Fed. 134; The Hamburg-Amerikanische, etc., v. Gye, 207 Fed. 247, 124 C. C. A. 517, and The Iowa, decided by this court, 213 Fed. 405, 130 C. C. A. 41.

The nonsuit was rightly ordered, and the judgment will be affirmed.