No. 24,454.

W. A. Gentry, *Appellee*, v. James C. Davis, as Agent and Director-general of Railroads, *Appellant*.

SYLLABUS BY THE COURT.

Master and Servant—*Fireman Injured by Jumping from Engine—Frightened at Headlight on Standing Train—No Danger Actual or Apparent—No Negligence—No Liability.* Where plaintiff was employed as a fireman on defendant's railroad, and while in the performance of duty on his engine, in approaching a station in the darkness where another locomotive was standing, the headlight of which was burning brightly in accordance with the rules and orders of the defendant company, with which plaintiff was familiar, the plaintiff, together with his engineer, became frightened because of an erroneously supposed imminent collision, and at an exclamation from the engineer to "jump," when two and a quarter miles from the other engine, jumped out of the gangway of his engine into the darkness and was injured, *Held*, that there being no danger, actual or apparent, created by the defendant, there was no negligence on the part of the defendant and no liability.

Appeal from Labette district court; Elmer C. Clark, judge. Opinion filed October 6, 1923. Reversed.

*W. W. Brown, A. G. Armstrong*, and *E. L. Burton*, all of Parsons, for the appellant.

*F. E. Dresia, Charles Stephens*, both of Columbus, and *Paul MacCaskill*, of Parsons, for the appellee.

The opinion of the court was delivered by

Hopkins, J.: The action was for damages for personal injuries sustained by plaintiff while in the employ of the defendant. Plaintiff recovered and the defendant appeals.

On November 8, 1918, plaintiff was a fireman on one of defendant's locomotives approaching the Condon station, Labette county, Kansas, from the south. At the station, headed southward, was another locomotive. It was night and the headlight of the locomotive standing at the station shone along the rails southward. When the engine, on which plaintiff was fireman, was distant two and a quarter miles from the station, the light of the other engine, or the exclamation of his engineer, frightened the plaintiff so that he jumped out of the gangway of his engine into the darkness and was injured.

It is contended by the defendant that the evidence shows no negligence on its part.

Three persons were on the engine at the time plaintiff jumped, the engineer, the head brakeman and the plaintiff. The testimony of these three comprise the evidence of what transpired on the engine. They disagree. The plaintiff testified that he was engaged in firing his engine; that it was equipped with an appliance which operated automatically to open and close the door as the coal was thrown into the fire box; that, as he moved forward with a shovelful of coal, the door opened momentarily and then closed while he was securing the next shovelful; that, just before he jumped, he had been putting coal into the fire; that the engine was moving over the track around a curve to the left at the rate of about twenty miles per hour and was distant from Condon station about two and a quarter miles; that, when he was shoveling coal he stood close to the fireman's seat, on the left of which is a large window; that there was also a window directly in front. Through these windows the fireman was able to see ahead. When an engine is going around a curve to the left observation can be made better from the fireman's side than from the engineer's side. That, while he was putting in the fire, the engineer jumped behind him and holloed, "Where are we at?" and when he came from behind yelled, "Jump!" That plaintiff, without looking, jumped out of the gangway.

The brakeman testified that he was standing immediately back of the engineer, who, at the time, occupied the engineer's seat on the east side of the locomotive; that he and the engineer were looking out of the window on the engineer's side; that he saw the fireman looking out on the west side. The engineer got up and started to the fireman's side of the engine and looked out and, while he was so doing, the fireman jumped; that the engineer said nothing about jumping until after the fireman was gone; that the engineer then said, "I guess we will have to get off." The witness started down the gangway on the right side of the engine and the engineer went down the gangway on the left side. The engineer had set the brakes before he started to get off and the train slowed down; that he (the brakeman) remained on the steps of the engine watching the light until the engine was almost stopped and then stepped off; that the engineer did not hollo "Jump" when he first saw the headlight, nor did he mention anything about getting off until after the fireman had jumped.

Gentry v. Davis, *Agent.*

The engineer testified that, as they were moving along, he was on the right side of the engine; that he noticed the fireman looking intently out of the cab window; that he himself saw the headlight across the curve of the track and got up from his seat and started to the fireman's side to get a better view. After looking out of the fireman's window, he turned around and already the fireman had jumped out of the gangway. The fireman had been standing behind him while he was engaged in looking out of the fireman's window; that, after he discovered the fireman had jumped, he set the brakes, stopped the train and got off.

The plaintiff recovered upon the theory that the engineer on seeing the light ahead, negligently became excited, believing that a collision was imminent, and negligently warned plaintiff to jump; that the engineer was negligent in failing to be more cool and collected and failing to give the warning in a proper tone. The findings of the jury were to the effect that the engineer gave his exclamation with the intention of promoting the safety of the persons on his engine; that he did so in good faith when suddenly confronted with a situation producing apprehension of danger, but that the engineer was negligent in not making proper observation. They returned a verdict against defendant for $10,000.

The evidence disclosed that south bound train extra 732 was, by its orders, and by the rules of the company, required to take its place on the main line track at Condon station and required to keep its headlight burning; that it was in every way complying with the orders and rules of the defendant company. The plaintiff knew these orders; was familiar with the rules governing the situation. He knew that the proper place for engine extra 732 south bound, was on the main line at Condon station and that his train, extra 730, was required, by the orders, to take the siding, and knew that the light of engine extra 732 would be burning as he approached the station and would shine along the track. There was no real danger, nor did the defendant create an appearance of danger to the plaintiff.

The plaintiff testified that:

"It was the practice and custom prevailing upon the railroad for the engineer to receive train orders and hand them to the fireman, and the fireman, after reading them, would hand them to the head brakeman. These orders were issued by the chief dispatcher, governing the movement of trains on the line. I saw the orders relative to the movement of south bound Extra 732 and north bound Extra 730, and knew where these trains were to meet and pass."

The rules in force at the time plaintiff was injured contained the following:

"210 (*a*). Each person to whom an operator is required to deliver a 31 order, must read it aloud to the operator, and understand it before acting upon it. Enginemen must read their orders aloud to conductors and understand them before acting upon them. Conductors must read their orders to rear brakemen and enginemen to their firemen, and when practicable, to the head brakeman.

"501. Firemen as well as enginemen must watch signals and switches carefully, as frequently the first view can be had from the fireman's side.

"502. Firemen, when on the road, are under the supervision and direction of the engineer, and must obey the orders of the engineer respecting the proper use of fuel and the performance of their duties.

"525. Firemen must report for duty at the time appointed; assist in shifting and making up their trains when necessary; assist the engineer in keeping a lookout on track for signals and obstructions, and look back frequently to observe running conditions of train; take charge of the engine during the absence of the engineer and not permit any unauthorized person to be upon it. They must not run an engine in the absence of. the engineer, unless, in some emergency they are directed to do so by the conductor or some one in authority. They must be familiar with the rules that apply to the protection of trains and the use of signals, which they must be prepared to use promptly. They should examine the bulletin board or book frequently and in every way fit themselves to be able assistants to the engineer."

It is clear that a recovery was had in this action based upon the warning given by the engineer. It is clear also that the engineer, believing a collision was imminent, acted in good faith in giving the warning. The question, therefore, does not involve the extent of danger, nor the actual appearance of danger, but is based squarely upon the action of the engineer, who, in good faith, but excitedly, gave an erroneous warning which was acted upon by the plaintiff without any consideration. The rules above quoted show that it was the duty of the fireman, as well as the engineer, to "watch signals and switches carefully, as frequently the first view can be had from the fireman's side." The fireman was also required to assist the engineer in keeping a lookout on the track for signals and obstructions. He was required to be familiar with the rules that apply to the protection of trains and use of signals and be prepared to promptly use the latter. The same duty rested upon the plaintiff to keep a lookout in approaching the station as was required of the engineer. At the time of this occurrence the fireman was not engaged in firing. He had completed his firing, at least for the time being. It was his duty to make observations, the same as the engineer.

There are many cases where a failure to give a warning by a person whose duty it is to give such warning, is held to be negligence. Recovery has been allowed in numerous other cases where one acted erroneously through fright or excitement in endeavoring to avoid actual danger negligently caused. No cases are submitted, however, where it has been held that giving a warning in good faith, believing that there was danger, when none, in fact, existed was negligence. We have examined the cases cited by plaintiff but find none applicable here. The failure of the engineer to exercise the best judgment did not constitute negligence on the part of the defendant. A remarkable result would be reached if the defendant could be held responsible for the lack of judgment, not only on the part of the engineer, but on the part of the plaintiff himself who jumped out of the gangway of his engine two and a quarter miles from the engine with which they erroneously thought a collision might occur. The plaintiff assumed the risk of determining his course of action when he misjudged the ordinary and usual condition which confronted him. Certainly the defendant should not be held responsible for the condition of his mind.

In *Mo. Pac. Rly. Co. v. Gedney,* 44 Kan. 329, 24 Pac. 464, it was held to be the duty of the engineer and fireman to keep a vigilant outlook and exercise ordinary diligence to frighten away animals that may be discovered approaching and in dangerous proximity to the track. It is urged by the defendant that, "If the negligence of the fireman in failing to keep a lookout can make the railroad company liable with reference to the killing of stock, it is difficult to see why the negligence of a fireman in failing to keep a lookout for his own welfare does not preclude liability on the part of the railroad company for his injury."

In *G. C. & S. F. Ry. Co. v. Knott,* 14 Tex. Civ. App. 158, it was said:

"It is demonstrated by the evidence in this case that appellee's danger was not real, but only apparent, and that its appearance, which he sought to avoid by jumping, did not exist when he went upon the car, in obedience to the order of his superior, to perform a service not in itself dangerous, actually or apparently, but occurred after he got on top of the car. If, then, this appearance of danger was not caused by appellant's negligence, it is difficult to perceive how he can recover in this action. It cannot be said that he was placed in a position of danger incident to his employment . . . because he was not in danger at all. . . . According to appellee's own testimony, he did not jump from the car because he was told to by Webb, but because he

apprehended it would turn over and crush him. So it seems that he would have endeavored to escape the apparent danger, whether warned to do so or not, and that the warning did not impel his action. However, we are yet to see a case holding that a servant can recover damages from his employer for injuries caused by his acting upon the cries of apparent danger to others which were not obvious to himself." (p. 165. See, also, *Hansen v. Railway Company*, 144 Minn. 330, 175 N. W. 549; *Wynn v. Railway Co.*, 133 N. Y. 575, 30 N. E. 721; *Bittner v. Crosstown Railway Co.*, 153 N. Y. 76, 46 N. E. 1044; *Berlin Mills Co. v. Croteau*, 88 Fed. 860, Note, 37 L. R. A., n. s., 43.)

The plaintiff here did not jump from the engine because he was commanded to do so by the engineer, but because of his erroneous judgment that he was in danger. True, his judgment was partly induced by the engineer's erroneous judgment. This, however, under the circumstances of the case, was not negligence on the part of the defendant. This conclusion makes it unnecessary to discuss other questions raised in the briefs.

The judgment is reversed with directions to enter judgment for the defendant.